IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CHEROKEE NATION BUSINESSES, LLC;
CHEROKEE NATION ENTERTAINMENT, LLC;
AND JENNIFER MCGILL                                                      PLAINTIFFS

VS.                                NO. 4:24-cv-969-dpm

STATE OF ARKANSAS; and ALEX LIEBLONG, MARK LAMBERTH,
STEVE ANTHONY, DENNY EAST, MICHAEL POST,
BO HUNTER, AND STEVE LANDERS,
in their official capacities                                            DEFENDANTS

## PLAINTIFFS' TRIAL BRIEF

Come now the Plaintiffs, Cherokee Nation Businesses, LLC ("CNB"), Cherokee Nation

Entertainment, LLC ("CNE"), and Jennifer McGill, by and through their attorneys, McDaniel

Wolff, PLLC and Clement & Murphy, PLLC, and for their Trial Brief, do state:

## INTRODUCTION

Plaintiffs incorporate by reference their Brief in Support of Plaintiffs' Motion for

Temporary Restraining Order and Preliminary Injunction, Responses to Motions to Dismiss, and

Plaintiffs' Second Amended Complaint. Fed. R. Civ. P. 10(c). For the reasons set forth below,

Plaintiffs will prevail on the merits at trial.

## UNIDISPUTED FACTS

### A. Amendment 100 and Issuance of Casino Gaming License to CNE

1.    Arkansas voters passed Amendment 100, the Arkansas Casino Gaming

Amendment, in the 2018 general election. Ark. Const. Amend. 100. The amendment became

effective on November 14, 2018. *Id*. Amendment 100 authorized four (4) casino gaming licenses

to be issued and regulated by the Arkansas Racing Commission ("ARC"). *See id*. § 4(i).

1

2.      Among other things, Amendment 100 required prospective licensees to obtain the approval of local officials in the country for which they sought a casino license. Ark. Const. Amend. 100 § 4(n). In the months after Amendment 100 was enacted, interested applicants sought local support from Pope County leaders.

3.      A number of interested applicants, including CNB and the Choctaw Nation of Oklahoma ("Choctaw Nation"), met with Pope County officials, such as County Judge Ben Cross.

4.      Although Choctaw Nation attempted to secure the support of Pope County officials and to obtain the Pope County casino license authorized by Amendment 100, it failed in both regards. The citizens of Pope County, Arkansas, by and through the Pope County Judge Ben Cross and the Pope County Quorum Court, decided to support CNB as the licensee for the Pope County casino license. Their support was memorialized in a Letter of Support from Judge Cross and a Resolution of Support passed by the Pope County Quorum Court. *See* Ark. Const. Amend. 100 § 4(n).

5.      In furtherance of that decision, Judge Cross negotiated and entered into an Economic Development Agreement ("EDA") on August 13, 2019, confirming Pope County's exclusive support for CNB and its affiliates. *See* **Exhibit A.**

6.      The EDA bound CNB to provide over $40 million in funds to support economic development in Pope County once the casino license was finally settled in CNB's favor.

7.      The Pope County Quorum Court also later issued a Resolution of Support for CNB's affiliate CNE as the applicant of choice for Pope County.

8.      The other potential applicants, including the Choctaw Nation, did not give up.

9.     For the next several years following execution of the EDA, the Choctaw Nation and another hopeful applicant, Gulfside Casino Partnership, continued in their efforts to override Pope County's decision to support CNB.

10.     CNB and its affiliates are the only entities that have ever been qualified under Arkansas law to hold the Pope County casino gaming license.

11.     CNB and its affiliates endured numerous challenges to their status as applicants before Arkansas circuit courts and the Supreme Court of the State of Arkansas until finally, on June 27, 2024, the ARC awarded the Pope County casino license to CNE.

**B.  History of LVC and Involvement of Choctaw Nation**

12.     Throughout the course of this litigation, a small faction of anti-casino advocates in Pope County also joined litigation around the casino license. These advocates were supported by the considerable resources of the Choctaw Nation, including by sharing the same attorney and lobbyists.

13.     Choctaw Nation owns a casino in Pocola, Oklahoma, straddling the Oklahoma-Arkansas line. While the casino itself is situated in Oklahoma, its parking lot sits across the border in Arkansas. That casino is approximately an hour and seventeen minutes from the site of the planned CNE casino in Pope County. Choctaw Nation has represented that the CNE casino, if built, would draw customers away from the Choctaw Nation casino, such that Choctaw Nation will lose money.

14.     Specifically, Choctaw Nation estimates it will lose about $12,000,000.00 annually if CNE builds its casino in Pope County. **Exhibit B**, p. 6-7, Choctaw Nation Motion to Intervene in Case No. 60CV-21-1653. Expert testimony from Cory Morowitz will also establish this figure to be correct. Having failed in its efforts to obtain the Pope County casino license for itself,

Choctaw Nation decided to use the Arkansas ballot initiative process to terminate CNE's casino license. Choctaw Nation would accomplish this goal by funding a proxy organization—Local Voters in Charge ("LVC")—to propose a ballot question that would again amend the Arkansas Constitution, revoke CNE's license granted under Amendment 100, and effectively eliminate CNE as a present or future competitor to the Choctaw Pocola casino located just over the Oklahoma state line.

15.    In 2020, the small Pope County faction of anti-casino advocates established a ballot question committee named "Fair Play for Arkansas" to offer an amendment to the Arkansas Constitution to terminate the Pope County casino license.  The group had minimal activity and failed to secure enough signatures to place its proposed amendment on the November 2020 ballot. On June 11, 2021, the same people (this time spurred by the Choctaw Nation) tried again and established the ballot question committee named "Fair Play for Arkansas – 2022" to support that effort. This ballot question committee was funded almost exclusively by the Choctaw Nation. Like the earlier version of itself in 2020, the ballot question committee failed to secure enough signatures to get its measure on the 2022 ballot.

16.    In January 2024, that faction created another ballot question committee, LVC. All three of these ballot question committees had the same members: Jim Knight, Bill James, Hans Stiritz, and Rick Thone. Each of these individuals resides in Pope County. LVC, like its predecessor, was funded almost exclusively by the Choctaw Nation. ***See*** **Exhibit C**. It also shared an attorney with the Choctaw Nation (Nicole Gillum), and its legal services, along with all other expenses, were paid by funds from the Choctaw Nation.

17.    LVC proposed Issue No. 2, a new constitutional amendment, which would partially repeal Amendment 100 by eliminating the authorization to issue a Pope County casino license,

which CNE held (the "Proposed Amendment").

18.    LVC differed from its earlier versions in that it disguised itself as a group of "local control" advocates. Fair Play for Arkansas, created on May 15, 2020, stated the following as its purpose: "The committee advocates for an amendment to the Arkansas Constitution in the November 2020 General Election to remove Pope County as a location for a casino as stated in Arkansas Constitutional Amendment 100." **Exhibit D**. Fair Play for Arkansas – 2022, created on June 11, 2021, stated the following as its purpose: "The committee advocates for an amendment to the Arkansas Constitution in the November 2022 General Election to remove Pope County as a location for a casino as stated in Arkansas Constitutional Amendment 100." **Exhibit E.**

19.    The statement of organization for LVC, on the other hand, provides a description of the measure which adds in the disguise of local control: "The committee advocates for an amendment to the Arkansas Constitution in the November 5, 2024, General Election to repeal authorization for a casino and casino gaming in Pope County, Arkansas, as provided in Arkansas Constitutional Amendment 100, *and to require a local option vote for any future potential casino locations*." (emphasis added). **Exhibit F.**

20.    The Proposed Amendment, among other things, amends subsections (i), (k), (m), and (n) of Amendment 100, § 4 of the Arkansas Constitution. The combined effect of these amendments is to remove the requirement that the ARC issue a casino license for a casino in Pope County, Arkansas. The Proposed Amendment also adds subsections (s) and (t) to Amendment 100, § 4. New subsection (s) revokes "a casino license" if it was "issued for a casino in Pope County, Arkansas prior to the effective date of this Amendment." New subsection (t) purports to provide a process by which a casino license may be issued in any county (aside from Crittenden, Garland, and Jefferson Counties) if a majority of the voters in the county approves a casino, **but only after**

a future constitutional amendment passes in a statewide vote, and such amendment "authorizes or otherwise allows" for such a license in that county and does not repeal the process. The design and effect of Amendment 104 is to (1) revoke CNE's existing Pope County casino license and (2) make it impossible to obtain a new license without an amendment to the Arkansas Constitution, which must be approved by a statewide referendum. Operating a casino in Pope County without a license would constitute a felony under the laws of Arkansas. *See* Ark. Code Ann. § 5-66-103.

21.     Arkansas law provides that an amendment initiated by popular petition must pass a review process by which the Attorney General ensures that the measure is not confusing to voters. After some back and forth, the final measure sent to the Arkansas Attorney General's office trained its sights directly on the Pope County casino license. With that focus, on March 20, 2024, Arkansas Attorney General Tim Griffin certified a popular name and ballot title for the Proposed Amendment as clear enough for Arkansas voters. Notably, this occurred *before* the license was issued to CNE (June 27, 2024) and, accordingly, the proposed ballot measure made no mention of CNE holding the Pope County license. The license is attached hereto as **Exhibit G**. However, there was no procedure under Arkansas law to correct or update the popular name, ballot title, and Proposed Amendment to reflect the issuance of the license.

22.     Because of this, and despite the Proposed Amendment being directly aimed at CNE's license, the popular name, ballot title, and the Proposed Amendment did not disclose to the electorate that approving Issue 2 would result in revoking CNE's casino gaming license. Attached hereto as **Exhibit H** is the popular name, ballot title, and Proposed Amendment.

23.     On July 31, 2024, Arkansas Secretary of State John Thurston certified Issue 2 to the ballot for the November 5, 2024 general election.

24.     On November 5, 2024, Arkansas voters passed Issue 2. Pope County, the location of the license Issue 2 would revoke, rejected Issue 2. Upon passage, Issue 2 became Amendment 104 to the Arkansas Constitution.

### C. Issue 2 Campaign, Outside Interest Control and Passage of Amendment 104

25.     Arkansas law requires the Secretary of State to determine whether a voter initiated constitutional amendment is supported with a sufficient number of petition signatures to qualify for the ballot. The members of LVC were not instrumental in gathering the signatures necessary to place the Proposed Amendment on the ballot. Choctaw Nation funds were used to pay out-of-state canvassing companies to collect signatures.

26.     The LVC members did not manage and were not in direct contact with the out-of-state paid canvassing companies. "LVC committee member Hans Stiritz testified that he understood PCI [Consultants, Inc.] would hire whomever it needed to carry out the canvassing. Consequently, PCI entered separate contracts with three entities: (1) Florida Petition Management (FPM); (2) Cape Campaigns; and (3) Engage the Voter. FPM hired Phil Dewey to run an office in North Little Rock. Stephanie Marcynyszyn of Cape Campaigns managed another canvassing office. Berta, or "Ashley," Erickson of Engage the Voter managed an office in Northwest Arkansas. Dewey, Marcynyszyn, and Erickson signed the sponsor affidavits submitted by LVC to register its paid canvassers." *McGill v. Thurston*, 2024 Ark. 146, at 4, 698 S.W.3d 121, 123. These managers were responsible for onboarding and training of paid canvassers. *Id.* at 5, 698 S.W.3d at 124. "Together, these three groups acted in concert to arrange for the circulation of an initiative petition and to then file the petition with the Secretary." *Id.* at 9, 698 S.W.3d at 126.

27.     The Arkansas Supreme Court concluded that the managers of the out-of-state paid canvassing companies were "sponsors" for purposes of Ark. Code Ann. § 7-9-601(b)(3). *Id.*

28.    Thus, there is no dispute that an out-of-state entity funded other out-of-state sponsors to amend the Arkansas Constitution.

29.    Similarly, LVC had little involvement with advertisements and the campaign for Issue 2. It is undisputed that most of the advertisements came from out-of-state entities, and these advertisements were misleading to Arkansas voters.

30.    Amendment 104 was sold to the voters on the misleading claims that it would leave "current casinos alone," that it would *not* affect "existing jobs, revenues, or casinos," and that Amendment 104 would *only* effect "proposals for any new casinos."

31.    Noticeably absent from advertisements is any mention that a license had been issued in Pope County, or even that the Pope County license would be affected. The words "CNE" or "Cherokee" never appear in any advertisements.

32.    Proponents utilized text messaging to reach Arkansas voters. A text message sent to voters stated that Issue 2 "stops casinos from being forced into communities that don't want them. . . ." As apparent by the Pope County vote against Issue 2, Issue 2 also took away a casino from a community that did want it. And the precondition of a constitutional amendment for a new casino in any county meant that a county that wants a casino must first obtain statewide permission—the antithesis of "local control".

33.    One text message sent to voters stated that Issue 2 gives "voters the final say on any new casino." But it did not give Pope County the final say, as Pope County clearly wanted the CNE casino.  Nor did Issue 2 give Pope County voters final (or any) say on whether to revoke CNE's casino license, which was issued only after CNE had secured local (Pope County) support for casino gambling, as required by Amendment 100; instead, the CNE license was automatically

revoked by the Issue 2 amendment, despite Pope County voters' opposition to Issue 2 in the election.

34.    One text message and a direct mailer claimed that ballot question committees associated with Plaintiffs, lobbyists, and politicians were "lying about Issue 2."

35.    Another text message ironically stated "Don't let out-of-state gambling lobbyists force new casinos into communities that don't want them." There were no out-of-state gambling lobbyists for Plaintiffs or for ballot question committees associated with Plaintiffs. And there were certainly none that forced a casino into a community (Pope County) that did not want one, apparent from the Pope County vote against Issue 2.

36.    Television, radio, direct mail, digital, and print advertisements conveyed these misrepresentations as well. A direct mailer stated that Issue 2 "lets local voters decide whether casinos are in their best interests." Issue 2 did not let Pope County voters decide what was in their best interests.

37.    The LVC website stated "This amendment respects the right of voters in ALL Arkansas counties to have the final say on whether their community would have a casino or not." (emphasis in original). Nothing in Issue 2 impacted or gave "local control" to voters in Jefferson, Crittenden or Garland Counties.  And again, nothing gave "local control" to voters in Pope County.

38.    The website also stated that "It's wrong for people to make decisions about a casino in another county where they don't live." That's exactly what Amendment 104 did to Pope County. The website stated that Issue 2 ensures "that neither Pope County, nor any other county, will have a casino unless local voters want one." Pope County, evidenced by the vote against Issue 2, wanted a casino, and nothing in Issue 2 allowed the other three counties with casino gaming licenses the "local control" that LVC and Choctaw Nation pitched to Arkansas voters.

39.    Every single advertisement was paid for by Choctaw Nation funds.

**D.  Testimony of LVC Officers and Relative Documents**

40.    The following will be established through testimony of LVC officers and relative documents.

41.    LVC and Choctaw Nation used the same lobbyists, specifically John Burris and his firm Capital Advisors Group.

42.    Funds from Choctaw Nation were used to pay all lobbying and attorney fees for LVC.

43.    LVC did not have a contract with Capital Advisors Group and John Burris.

44.    LVC and Choctaw Nation used same attorney, specifically Nicole Gillum.

45.    Bill James was the treasurer of LVC. However, Bill James never prepared or reviewed required financial disclosure reports before filing with the Arkansas Ethics Commission.

46.    The voter initiative process to amend the Arkansas Constitution is rigorous.

47.    LVC could not have achieved its goal without Choctaw Nation funding.  Fairplay for Arkansas failed in 2020 because it did not have enough funding to utilize paid canvassers (Choctaw Nation did not contribute to Fairplay for Arkansas).

48.    LVC could not have achieved its goal without paid canvassers.

49.    Thus, substantial funding and paid canvassers are required to pass a constitutional amendment in Arkansas.  Without that, it is impossible to cover a geographical area of the state to ensure a ballot question committee meets the requisite number of signatures by county.

**E.  Affected Contracts and Costs in Pursuit of and in Reliance on Gaming License**

50.    Plaintiffs set forth the following contracts that Amendment 104 substantially impairs:

a.  Employment contract with Jennifer McGill, dated October 6, 2019, and Confidential, Proprietary Rights and Non-Solicitation Agreement with Jennifer McGill.

b.  Multi-Service Letter Agreement with Legends Hospitality, LLC, dated May 23, 2019.

c.  EDA with Pope County, dated August 13, 2019.

d.  Base Professional Service Agreement with Barrett and Associates, Inc., dated November 11, 2019.

e.  Base Professional Service Agreement with Garver, LLC, dated March 20, 2020.

f.  Construction Management Agreement with CDI Contractors, LLC, dated July 13, 2022.

g.  Agreement for Architectural Services with HBG Design Architects, P.C., dated August 7, 2022 (amended December 16, 2022).

h.  Project Management Services Agreement with Convention Sports and Leisure International, LLC, dated October 12, 2022 (retroactive to June 1, 2019).

51.  Plaintiffs spent substantial time and money pursuant to these contracts and in pursuit of and reliance on the casino gaming license.

### F. *Testimony of Members of Arkansas Racing Commission*

52.  Plaintiffs deposed each member of the ARC. The following will be established at trial through the Commissioners' testimony.

53.  Casino gaming licenses are not revocable at the will or discretion of the ARC.

54.  The ARC can only revoke a casino gaming license for failure to meet the terms of Amendment 100 or violation of the Casino Gaming Rules.

55.     Casino gaming licensees have a legitimate expectation to retain their license if they are in compliance with Amendment 100 and the Casino Gaming Rules, and pay the necessary renewal fee.

56.     The ARC cannot act arbitrarily in revoking a casino gaming license.

57.     The ARC must provide notice and a hearing before revoking a casino gaming license.

58.     The ARC must renew a casino gaming license unless the license holder is in violation of Amendment 100. If the license holder is in compliance with Amendment 100, its license must be renewed.

59.     Electronic games of skill and casino gambling are interchangeable or at least closely related.

60.     The ARC has never taken any negative action – revocation, suspension, reprimand or a lesser punishment – against any casino gaming licensee or any entity operating electronic games of skill.

61.     The ARC has never conducted an investigation into any casino gaming licensee or operator of electronic games of skill for violations of Amendment 100 or Arkansas law.

62.     The ARC does not have staff or has minimal staff to conduct investigations into violations of Amendment 100 or the Casino Gaming Rules.

63.     If the ARC did find a potential violation of Amendment 100 by a casino gaming licensee, the ARC would work with the licensee to correct the violation.

64.     There is no procedure under the Casino Gaming Rules for revocation or suspension of a casino gaming license.

65.    A casino gaming licensee may sell its license to another entity if other entity is qualified under Amendment 100.

66.    ARC cannot arbitrarily deny an application of casino licensee to transfer its license.

67.    Acceptance of the casino gaming license by CNE constituted an agreement by CNE with the ARC and to be bound by the ARC's rules; CNE was bound by the representations it made to the ARC (regarding the timeline for opening casino, project details, and financial stability); and CNE acted reasonably in relying upon the casino gaming license to spend money and efforts to advance its casino project.

68.    The representations between CNE and the ARC, and actions and reliance thereon, constitute an enforceable agreement.

69.    CNE has never violated Amendment 100 or the Casino Gaming Rules.

70.    Issue 2 was confusing, particularly in that it failed to clearly identify how it would affect CNE's license and did not clearly elaborate the differential treatment it was giving to different counties.

71.    ARC Commissioners were contacted by voters who were confused by Issue 2, and some of the Commissioners themselves expressed confusion as to the effect of Issue 2.

72.    Currently, there are no measures being taken by the Governor of Arkansas, the General Assembly, the ARC, or any other state body to slow or curb casino gaming.

73.    There are, however, measures to expand gaming in the state, including but not limited to sports betting.

74.    Casino gaming is likely to increase in the future.

75.     ARC Commissioners are not aware of any studies or reports identifying what effect terminating the Pope County casino license will have on the amount of casino gambling in the State.

76.     Without any reports or studies point to, ARC Commissioners are unable to say with any precision what effect eliminating the Pope County casino license would have on casino gambling in the State.

## SUMMARY OF EXPERT OPINIONS

### A. Robert Ruben

77.     The revocation of CNE's casino gaming license, specifically by a constitutional amendment, does not comport with, and was in fact a complete departure from, the custom for revocation of a casino license in the United States.

78.     Every jurisdiction in which Mr. Ruben has practiced requires notice and hearing prior to revocation of a casino gaming license.

79.     Casino gaming licenses are revoked only in the most egregious circumstances. Licensees in all jurisdictions have a legitimate expectation to retain gaming licenses if they remain in compliance with governing law and regulations.

80.     The EDA did not contemplate a constitutional amendment revoking CNE's casino gaming license.

81.     Amendment 100 and the Arkansas Casino Gaming Rules, along with the Arkansas Administrative Procedures Act, provide a framework similar to most states in that they require notice and a hearing prior to revocation, and that revocation must be based upon a violation of Arkansas law.

82.     Because CNE was in compliance with Amendment 100 and the Arkansas Casino

Gaming Rules, the revocation of CNE's casino gaming license was not reasonably foreseeable. In other words, CNE had a reasonable expectation that its license would not be revoked.

83.     Amendment 104 was further unforeseeable in that it targeted only CNE.

84.     Just as it is unforeseeable that a statute would revoke a casino gaming license authorized by statute, it is unforeseeable that a constitutional amendment would revoke a casino gaming license authorized by a prior constitutional amendment.

85.     Whether a jurisdiction is heavily regulated or to what extent it is regulated cannot be determined by examining the regulations alone.

### B.  Cory Morowitz

86.     The value of CNE's casino gaming license at the time Amendment 104 passed was more than $100,000,000.00.  This constitutes the value of the license itself.

87.     A new casino in Arkansas, specifically the CNE casino, would increase gaming participation and spending by Arkansas residents minimally, from 28.96% of the adult population in Arkansas participating in gaming to 30.33%, a 1.38% increase.

88.     Arkansas residents are currently spending approximately $725.6 million annually on casino gaming, excluding mobile sports betting. The opening of the CNE casino will only increase this spending by $32.9 million, or 4.76%. This represents a 0.03% increase in casino gaming spending as a percentage of state residents' income.

89.     CNE will negatively impact the Choctaw Pocola casino because it will draw away patrons who live in west central and western Arkansas who presently visit the Pocola casino. The total impact on the Pocola casino will be approximately $11.8 million annually (in 2024 dollars).

90.     The licensure fee in Arkansas is minimal compared to most jurisdictions, specifically $250,000.00. Minimal licensure fees are utilized to open markets, foster competition,

encourage large-scale development, and ensure financial viability of new casino project developments.

91.    Likewise, Arkansas requires a minimal renewal fee compared to other jurisdictions, specifically $10,000.00.

92.    Arkansas issues casino gaming licenses for a ten-year period, which is longer than most jurisdictions.

93.    If a casino gaming licensee, whether in Arkansas or in other jurisdictions, complies with applicable regulations, the licensee has a legitimate expectation to maintain its license. Even if there is a violation, minimal violations do not result in revocation or suspension of licensure. Thus, the risk of revocation is not quantifiable, and casino licenses are considered "long-lived assets."

### C. David Couch

94.    The voter initiative process to amend the Arkansas Constitution is heavily regulated. In recent years the trend has been to impose more regulations on the process, not less. For example, the legislature enacted a law requiring that a certain amount of signatures be gathered from at least fifty (50) counties.

95.    Because of the difficulties in the voter initiative process, sufficient funds and paid canvassers are necessary for voter initiative to be successful.  With that comes an obstacle, specifically that the regulations on paid canvassers are substantial.

96.    Because of the difficulty in the process, historically and statistically voter initiatives have a minimal likelihood of success.

97.    In the past three election cycles, at least thirty-four (34) voter initiatives to amend the Arkansas Constitution have been proposed. Only one was successful (the one at issue in this

case). That constitutes a 2.9% success rate for proposed voter initiatives to amend the Arkansas Constitution. Notably, two of these elections were before the enactment of Act 236 of 2023 which made voter initiatives even more difficult by raising the signature threshold.

98.     David Couch was instrumental in drafting Amendment 100, and it was drafted with the intent that a licensee can retain its license for as long as it continues to comply with Arkansas law.

99.     There has never been a state constitutional amendment that has repealed a right or privilege granted by an earlier state constitutional amendment.

100.     No person, entity, or ballot question committee has ever raised or spent as much money towards an Arkansas initiative as the Choctaw Nation during the 2024 election cycle. Thus, the Issue 2 initiative was an outlier historically.

101.     There is no procedure under Arkansas law to amend a ballot title and popular name after certification by the Attorney General.

## ARGUMENT

### A.  *Amendment 104 Violates the Contract Clause*

The United States Constitution sets forth that states shall not pass laws impairing the obligation of contracts. U.S. Const. art. I, § 10, cl. 1. A violation of the Contract Clause occurs when a state law "operate[s] as a substantial impairment of a contractual relationship" and fails to appropriately and reasonably advance "a significant public purpose." *Ashley Sveen v. Kaye Melin*, 584 U.S. 811, 819 (2018). Amendment 104 substantially interferes with CNB and CNE's contracts with vendors, contractors, architects, engineers, and government entities (like the EDA with Pope County, which, among other provisions, requires CNE to pursue and utilize the casino license). Many of these contracts were executed not only in reliance upon the casino gaming license and in

pursuit thereof, but also to satisfy obligations under the Casino Gaming Rules and Amendment 100. CNE has substantial investment-backed expectations based on the time and resources it expended in reliance on Amendment 100, and the casino gaming license issued pursuant thereto. Amendment 104 also interferes with contracts with employees like Plaintiff McGill. Many of these contracts cannot be terminated at will. Amendment 104 completely nullifies, or at the very least, substantially impairs these existing contracts in violation of the Contract Clause. *See Honeywell, Inc. v. Minn. Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 558 (8th Cir. 1997) ("[T]otal destruction of a contract is a substantial impairment"). This substantial impairment was not foreseeable at the time of execution of the contracts.

Relying on *Hawkeye Commodity Promotions, Inc. v. Miller*, 486 F.3d 430 (8th Cir. 2007), Defendants attempt to establish reasonable foreseeability of this impairment and state "there is no question that casino gaming in Arkansas has been well-regulated in the past and that the prospect of CNE losing its license *could* always be accomplished by constitutional amendment, i.e., through the very same process that made possible CNE's casino-gaming license in the first place." Brief in Support of Defendants' Motion to Dismiss First Amended Complaint, p. 17 (emphasis added). But constitutional amendments are, almost by nature, not reasonably foreseeable. Indeed, as the trial evidence will show, relatively few amendments are even proposed each year, and of those few amendments, fewer still actually pass. Thus, Plaintiffs' witnesses, including the Defendants, will all testify that CNE had a legitimate expectation that it could keep its license in perpetuity as long as it complied with Amendment 100 and the Casino Gaming Rules. Even when licensees, whether in Arkansas or in other jurisdictions, violate relevant regulations, only egregious violations result in the suspension or revocation of casino gaming licenses.

The evidence will establish that since enactment of Amendment 100 in 2018, the casino industry has not been highly regulated, and has certainly not been regulated to a degree that would render this kind of interference foreseeable. Casino gaming under Amendment 100 has been legal in Arkansas for approximately six (6) years now (and gambling for much longer). The Casino Gaming Rules were promulgated pursuant to Amendment 100 and set the regulatory framework for casino gaming in Arkansas. These rules have been amended only a few times since adoption, but nothing in the rule changes affected any contracts or license eligibility. Nothing in these rules provides a procedure for revocation or suspension. The ARC, during this six-year period, has not sanctioned any licensee. It has not revoked or suspended any casino gaming license.  It has not investigated any licensee.  That cannot be said for many other types of licenses like medical licenses and contractor licenses. And the ARC has not, by its actions or rules, interfered with any person's or entity's contract or denied any transfer of license or interest in a license.  And every commissioner will testify that CNE had a legitimate expectation to retain its license.

But regardless of how regulated casino gaming has been, an amendment to the Arkansas Constitution is not foreseeable for purposes of the Contract Clause. An amendment to the Arkansas constitution is not an agency regulation. Plaintiffs do not dispute that to establish substantial impairment of their contractual relationships, the law impairing those contracts – here Amendment 104 – must not have been reasonably foreseeable. No case law exists that supports a finding that a constitutional amendment via voter initiative is foreseeable. Amending the Arkansas Constitution is no easy task. At the time Pope County and CNB entered the EDA in 2019, there had been no prior constitutional challenges to repeal, target, limit, or otherwise adversely impact the Pope County casino license. Just the year prior, voters approved of the casino by an eight (8) point margin.

The procedures and regulations on how to amend the Arkansas Constitution are numerous and onerous. Ark. Code Ann. § 7-9-101, *et seq*. The sponsor of the amendment must draft a popular name, ballot title, and proposed amendment and submit to the Arkansas Attorney General for review and approval before circulating for signatures. Ark. Code Ann. § 7-9-107. If approved, the sponsor starts the signature gathering process, a highly regulated process that requires strict compliance with ever-changing regulations. *See* Ark. Code Ann. §§ 7-9-103–9; *see also* Ark. Code Ann. § 7-9-111(f); Ark. Code Ann. § 7-9-601. The canvassing efforts must hit certain percentage quotas for a certain number of counties and across the state. *See* Ark. Const. Amend. 7; *see also* Ark. Code Ann. § 7-9-126(e). The signatures must be submitted to the Secretary of State for verification, and if the quotas are facially satisfied, the Secretary of State certifies the measure for the ballot. Ark. Code Ann. § 7-9-111. Finally, the measure must then obtain a majority of votes cast for passage.

Since 2020, numerous voter measures to amend the Arkansas Constitution have been sponsored, but few have passed. The following is a brief overview of the low success rate of proposed Arkansas constitutional amendments:

- In 2020, at least fifteen (15) voter initiatives were proposed. None of those made it to the ballot.

- In 2022, at least eleven (11) voter initiatives were proposed. Only one made it to the ballot (Issue 4 – Legalize Marijuana in Arkansas), and it was rejected by the Arkansas electorate.

- In 2024, at least eight (8) voter initiatives were proposed. Only one made it to the ballot (Amendment 104), which was adopted by the Arkansas electorate.

In summary, in the past three election cycles, at least thirty-four (34) voter initiatives to amend the Arkansas Constitution have been proposed. Only one was successful (the one at issue in this case). That constitutes a 2.9% success rate for proposed voter initiatives to amend the Arkansas Constitution. Notably, two of these elections were before the enactment of Act 236 of 2023, which made voter initiatives even more difficult by raising the signature threshold. Additionally, in regard to any argument that CNE and CNB should have foreseen Amendment 104 because of LVC officers' past attempts to amend the Arkansas Constitution, the EDA was executed in 2019, before LVC officers' former ballot question committees began trying to repeal authorization for the Pope County casino gaming license. LVC officers' first ballot question committee following the enactment of Amendment 100 – namely Fair Play for Arkansas – was not formed until May 15, 2020, and it had minimal activity.

Further, the fact that the contractual obligations of the government, rather than a private party, are at issue in this case is significant. The Supreme Court has noted that under the federal Contracts Clause "impairments of a State's own contracts would face more stringent examination ... than would laws regulating contractual relationships between private parties." *Allied Structural Steel*, 438 U.S. at 244 n. 15, quoted in *City of Golden v. Parker*, 138 P.3d 285, 293 n. 3 (Colo. 2006). The EDA with Pope County is a contract with the State. The Court has previously questioned the weight it should assign to the usual force majeure language in the contract. Although that standard language is present, even the list of circumstances present in the force majeure provision fails to include or consider the possibility of a constitutional amendment eliminating the Pope County casino license.  Nothing in the EDA evidences *any* foreseeability of a constitutional amendment negating the EDA. As set forth above, constitutional amendments are huge tasks and not foreseeable.

The application process, Casino Gaming Rules, and Amendment 100 established an implied-in-fact contract with the State of Arkansas based upon the agreements and understandings between CNE and the ARC. *Hawkeye*, 486 F.3d 430 (8th Cir. 2007). An implied contract is proven by circumstances showing the parties intended to contract or by circumstances showing the general course of dealing between the parties. *Crown Custom Homes, Inc. u. Buchanan Serus., Inc.*, 319 S.W.3d 285, 289 (Ark. App. 2009) (citing *Steed u. Busby*, 593 S.W.2d 34 (Ark. 1980)). Defendants' testimony will establish that CNE, when applying for the Pope County casino license, made several representations to the ARC. Those representations included detailing CNE's gaming experience, establishing an eighteen (18) month timeline for opening a casino, demonstrating proof of financial stability, and describing how big the casino would be and what kind of gaming would occur. Defendants will testify that they expected CNE to follow through on the promises it made in its application, and awarded CNE the license based on those offers. Once CNE was awarded the license, based on the language of Amendment 100, it expected to keep the license in exchange for fulfilling its promises and complying with Amendment 100 and the Casino Gaming Rules. Amendment 100 states that the ARC "*shall* issue a renewal casino license within ten days to any licensed casino that complies with the requirements contained in this Amendment, including without limitation the payment of the casino license renewal fee, which shall not exceed $10,000. Casino licenses *shall* be renewed every ten years." Ark. Const. Amend. 100, § 4(q) (emphasis added). The plain language of Amendment 100 indicates the clear requirement and intention of the ARC to contract with CNE for the continuing renewal of the casino license. Because the implied-in-fact contract is for a set number of years with renewal mandatory thereafter if objective criteria are satisfied, the implied-in-fact contract is subject to the protections afforded by the United States Constitution. *Hawkeye Commodity Promotions, Inc. v. Miller*, 432 F. Supp. 2d 822, 846 (N.D.

Iowa 2006). Amendment 104 nullified this contract, and the ten-year license guaranteed to CNE by the Arkansas Constitution.

It cannot be overstated that, in addition to the onerous process of amending the Arkansas Constitution and the fact that a state contract is at issue, it is not foreseeable that a targeted voter initiative – not a broad regulation addressing a broad societal interest – will take away one of four casino licenses. Should Oaklawn foresee that its establishment and license might be singled out and rendered useless and revoked by a constitutional amendment? Southland? Saracen? How about an initiative that revokes Walmart's ability to sell alcohol at its stores but does not affect Costco? Of course not. No entity can reasonably foresee being targeted by a voter initiative. Expert and factual testimony will establish that a casino licensee, if in compliance with Amendment 100 and the Casino Gaming Rules, has an absolute expectation to maintain its license. Thus, CNE and CNB had a "reasonable expectation" that their contracts would not be impaired. *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 416 (1983).

Lastly, *Hawkeye* again is distinguishable: "State authority to regulate gambling is . . . well-established: 'No one would question that [the State] has the power to regulate gambling in the interest of the public health, safety, and general welfare.'" *Hawkeye*, 486 F.3d at 438 (quoting *Neb. Messenger Servs. Ass'n v. Thone*, 611 F.2d 250, 251–52 (8th Cir. 1979)). But there is no evidence here that Amendment 104 promotes public health, safety, or general welfare, nor do Defendants seriously argue that it does. Instead, they simply argue that it serves to promote local control. But as discussed in greater detail in Subsection F below, that is not true either. Rather, it was at all times designed to advance the material economic interests of CNE's business competitor, Choctaw Nation. The Eighth Circuit has made clear that "the Contract Clause provides greater protection for contractual rights than the 'less searching' rational basis standard applied under the Due Process

Clauses." *Ass'n of Equipment Mfrs. v. Burgum*, 932 F.3d 727, 734 (8th Cir. 2019), citing *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984). "To avoid collapsing the specific prohibition of the Contract Clause into the more general Due Process Clause, a reviewing court must require the State to demonstrate more than a conceivable or incidental public purpose for impairing the obligation of contracts." *Id.*

The Defendants cannot satisfy this burden. The State's express public policy on the matter is at odds with Defendants' assertions. There is no broad societal interest in revoking gaming in one county alone. Instead, the legislature has already determined that such restrictions on gaming cause "Arkansans [to] travel to adjoining states in order to wager at legal gambling establishments in those states. This adversely impacts Arkansas tourism and results in certain economic activity leaving Arkansas for the benefit of adjoining states." Ark. Code Ann. § 23-113-101(a)(4). The Choctaw Nation itself estimates that Arkansans spend $12,000,000.00 annually at its establishment alone. "Wagering" is "considered to be vital to the state and local economies." *Gallas v. Alexander*, 371 Ark. 106, 127, 263 S.W.3d 494, 510 (2007). Further, electronic games of skill are still authorized in the State of Arkansas at any place of horse or dog racing (not to exceed one per county). Ark. Const. Amend. 100, § 9. Although there are only two counties that have utilized this method in the past, there is nothing that prevents such an establishment in every single county in Arkansas. *Gallas v. Alexander*, 371 Ark. at 127, 263 S.W.3d at 510. The people of the State of Arkansas can still gamble at Oaklawn, Southland, and Saracen. The people of Pope County clearly did not want the Pope County license to be revoked. So what public health, safety, or general welfare goal was accomplished? The State can point to none, and expert testimony, along with the State's public policy, will establish the stated purpose of "curbing gaming" to be a hollow, after-the-fact fabrication.

And even if the goal was to curb casino gaming by requiring future operators to receive county electorate approval or to establish local control, Amendment 104 could have accomplished that goal without targeting CNE. For instance, it easily could have imposed its local-referendum requirement without revoking CNE's already-issued license. Thus, the complete nullification of CNE's casino gaming license and Plaintiffs' contracts is invalid under the third prong of the Contract Clause test, which requires the impairment to be based upon reasonable conditions. Amendment 104 does nothing to address the interference it ultimately imposes upon the license holder CNE and other contracting parties, including Pope County. In other words, Amendment 104 "impose[s] a drastic impairment when an evident and more moderate course would serve its purposes equally well." *See Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete Through Ins. Com'r of Puerto Rico*, 125 F.3d 9, 15 (1st Cir. 1997) (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 31 (1977)). It could have only applied to future casino gaming licenses. Or it could have required a referendum vote by the people of Pope County before the current license could go into effect. That would be the obvious and intuitive way to advance proponent's purported objectives. Indeed, it is *so* obvious that even Defendants' counsel believed that was what the Amendment did. *See* Transcript of November 12, 2024 Hearing, p. 79, 82, 83. He was wrong. There is thus no dispute: the purpose was to revoke one casino gaming license and erect barriers to a local vote. Amendment 104 does not pass the test set forth above.

**B.  *CNE and CNB Have Protectable Property Interests for Purposes of Procedural and Substantive Due Process and the Takings Clause***

**1.  CNE Has a Protectable Property Interest for Purposes of Procedural Due Process**

The Due Process Clause protects individuals' rights to "life, liberty, [and] property." U.S. Const. amend. XIV, §1. Although states ordinarily set their own property laws, federal constitutional law determines what constitutes property within the meaning of the Fourteenth

Amendment. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978); *cf. Tyler v. Hennepin Cnty., Minn.*, 598 U.S. 631, 638 (2023) ("[T]he Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take." (quoting *Hall v. Meisner*, 51 F.4th 185, 190 (6th Cir. 2022) (Kethledge, J.))). "The text of the Fourteenth Amendment speaks of 'property' without qualification, and it is well-settled that state-created property interests, including some contract rights, are entitled to protection under the procedural component of the Due Process Clause." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 140 (3rd Cir. 2000), citing *Reich v. Beharry*, 883 F.2d 239, 243 (3rd Cir. 1989). With that rule comes a distinction: "not all property interests worthy of procedural due process protection are protected by the concept of substantive due process." *Id.*

Thus, establishing a property right for procedural due process protection is a lower bar than establishing an entitlement to substantive due process protection. This is consistent with the law laid down by the United States Supreme Court: "the Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights. The Court has also made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72 (1972). The United States Supreme Court visited the principle set forth in *Roth* again in the context of gaming and found a property interest sufficient for procedural due process protection. *Barry v. Barchi*, 443 U.S. 55, 64 (1979) (holding that "it is clear that Barchi had a property interest in his license sufficient to invoke the protection of the Due Process Clause.").

The lower bar is also evident by reviewing cases regarding liquor licenses in the context of procedural due process protection. The license issued to CNE is a ten year license that is subject

to a narrow list of instances in which that license can be revoked or have its renewal denied. Compare those licensure provisions with a liquor license granted for a term of only one year. Courts have found that even a short licensure period triggered procedural due process protection. *See Sea Girt Restaurant and Tavern Owners Ass'n, Inc. v. Borough of Sea Girt, N.J.,* 625 F. Supp. 1482 (D. N.J. 1986); *Club Misty, Inc. v. Laski,* 208 F.3d 615 (7th Cir. 2000) ("The license is revocable during its term only for cause, just like a public school teacher's tenure contract—a familiar example of 'property' as the Supreme Court has defined the term in the due process clauses of the Fifth and Fourteenth Amendments.").

### 2. CNE and CNB Have Protectable Property Interests in Contracts

CNE and CNB have executed numerous contracts, including the EDA with Pope County; contracts with architects, engineers, and construction companies; and many more. Many of these were executed not only in reliance upon the casino gaming license, but also to satisfy its obligations under the Casino Gaming Rules and Amendment 100. Arkansas law is clear that contractual agreements give rise to a protectable property interest. *Jasper Sch. Dist. No. 1 of Newton Cnty. v. Cooper*, 2014 Ark. 390, 441 S.W.3d 11. "It is axiomatic that the right to perform a contract and to receive its profits, and the right to performance by the other party, are property rights entitling each party to the fulfillment of the contract by performance. In other words, enforceable contract rights are deemed to be property rights." *McDermott v. McDermott*, 336 Ark. 557, 565, 986 S.W.2d 843, 847 (1999) (citation omitted), citing *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969).

Here, the contracts give CNB and CNE property rights protected under the Due Process Clause. In addition to Arkansas case law, this is supported by the United States Supreme Court and the Eighth Circuit Court of Appeals. *Perry v. Sindermann,* 408 U.S. 593, 599–601 (1972) (a professor's contract that could be terminated only for cause constituted a property right protected

27

by the 14th Amendment); *Singleton v. Cecil*, 176 F.3d 419, 422 (8th Cir. 1999) (property interests are created "by independent sources such as state law, municipal ordinance, or contract"); *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir.1994) (finding that even an "implied contract" can create a protectable property interest); *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 791 (2005); *Omni Behavioral Health v. Miller*, 285 F.3d 646 (8th Cir. 2002); *Buchanan v. Little Rock Sch. Dist. of Pulaski Cnty., Ark.*, 84 F.3d 1035, 1038 (8th Cir. 1996), citing *Brockell v. Norton*, 688 F.2d 588, 590–91 (8th Cir. 1982). "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571 (1934).

The contract with Pope County, a political subdivision of the State, cannot be terminated at will by the County. That fact is the same for numerous other contracts executed by CNE and CNB, and their subsidiary Legends Resort and Casino, LLC. Further, many contracts were executed to carry out promises made to the State of Arkansas, specifically the project it proposed ARC. Large sums of money and time have been spent in reliance on the license and in furtherance of CNE's obligation to perform as it represented to the ARC, and as accepted by the ARC. Thus, at a minimum, CNE and CNB have protectable property interests in contracts sufficient to guarantee them due process protection.

### 3. *Hawkeye* is Distinguishable

*Hawkeye* is significantly distinguishable and does not govern the outcome here. At its core, *Hawkeye* was dealing with Iowa law that was significantly more restrictive of gambling than is Arkansas law. *Compare Hawkeye*, 486 F.3d at 438-39 (gambling illegal in Iowa, with only certain exceptions), *with* Ark. Const. Amend. 100 (gambling expressly legal in Arkansas). Gambling in Iowa exists at the sufferance of the Iowa Legislature. *Hawkeye*, 486 F.3d. at 439 (Iowa gambling

exists at the sufferance of the legislature), *with* Ark. Const. Amend. 100 (constitutionally mandating legal gambling); *see* Ark. Const. Amend. 100, §4(e)(12); Casino Gaming Rule 2.13.16 (allowing Arkansas gaming licensees to sell their licenses). And along those same lines, the Arkansas legislature has expressly stated its policy in favor of creating a domestic casino gambling sector to avoid Arkansans leaving the state to go to nearby casinos (like the Pocola). Ark. Code Ann. § 23-113-101(a)(4); *Gallas v. Alexander*, 371 Ark. 106, 127, 263 S.W.3d 494, 510 (2007).

Moreover, the revocation here was significantly less foreseeable than that in *Hawkeye*. For example, Arkansas law guarantees renewal for licensees who remain in good standing, making termination of the license unpredictable in the ordinary course. Ark. Const. Amend. 100, § 4(e)(8); Casino Gaming Rule 4.030. And the Iowa governor appointed a committee to study certain gambling reforms prior to revoking Touchplay gaming, once more making the revocations more foreseeable in that context. *Hawkeye*, 486 F.3d at 436. Finally, *Hawkeye* did not involve a situation where the revoked license had been guaranteed by the state constitution. In that circumstance, where the state creates the strongest guarantee it possibly can, revocation is simply not foreseeable by the license holder.[1] These critical differences go to the core of *Hawkeye*'s reasoning and prevent it from controlling the outcome in this case.

### 4. CNE Has a Protectable Property Interest for Purposes of Substantive and Procedural Due Process and the Takings Clause

---

[1]    The *Hawkeye* court also suggested that it may be relevant whether the licensee has significant experience with license revocations and gambling bans in other jurisdictions. *Hawkeye*, 486 F.3d at 440. To whatever extent such experience may be relevant, CNE's total lack of such experience again supports the inference that *Hawkeye* is distinguishable and the revocation here was not foreseeable.

In addition to the property interests in contracts, the Attorney General has admitted that the ARC cannot act arbitrarily or without notice in revoking or suspending a license. *See* Transcript of November 12, 2024 Hearing, p. 77 (conceding there must be process before ARC takes away a license); *see also id.* at 43-44 (this Court agreeing that the ARC cannot arbitrarily revoke a license); *see also id.* at 96, 107 (this Court agreeing that there is a deep unfairness at issue). The core concept of due process is to protect against arbitrary action. *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). The testimony of the Defendants will also establish that the ARC cannot revoke or suspend a license under Arkansas state law unless (1) there has been notice and hearing and (2) a finding that the licensee has violated the Casino Gaming Rules or Amendment 100. The testimony will establish that CNE undoubtedly had a legitimate expectation that it would keep its license, and its license would be renewed, if it complied with Amendment 100 and the Casino Gaming Rules. The testimony thus aligns with the express provisions of Amendment 100 and the casino gaming rules, and confirms that Plaintiffs had a protectable property interest in their casino gaming license, which had been protected by Arkansas state law from arbitrary deprivation. This is consistent with Arkansas case law and the Administrative Procedures Act concerning negative actions against licensees. *See, e.g., Holloway v. Ark. State Bd. of Architects*, 352 Ark. 427, 101 S.W.3d 805 (2003), *Ark. Contractors Licensing Bd. v. Pegasus Renovation Co.*, 347 Ark. 320, 64 S.W.3d 241 (2001).

The same was not said in *Hawkeye* regarding the State of Iowa. It was not established that a license could not be revoked without notice or arbitrarily and, in fact, a license was not revoked, but rather the authority to conduct a certain game (Touchplay) was. But *Hawkeye* is also not applicable for numerous other reasons (all of which are set forth in the previous section). Based upon these distinctions, most importantly Arkansas law, CNE had more than a unilateral

expectation to maintain its license. Applying the standard set in *Stauch v. City of Columbia Heights*, 212 F.3d 425 (8th Cir. 2000), establishes CNE had an interest and legitimate expectation in maintaining its license. "To establish a property interest in the renewal of a license, the [Plaintiffs] must show more than a unilateral expectation of it." *Id*. at 429. "One manner in which state law can create a property interest is by establishing procedural requirements that impose substantive limitations on the exercise of official discretion." *Id*. The Eighth Circuit found "that the licensing scheme which limits the City's discretion to deny renewal, creates a protected property interest." *Id*. at 430. "Where a license can be 'suspended only upon a satisfactory showing' of misconduct, the licensee has 'a property interest in his license sufficient to invoke the protection of the Due Process Clause.'" *Spinelli v. City of New York*, 579 F.3d 160, 169 (2nd Cir. 2009), quoting *Barry*, 443 U.S. at 64; *see also Richardson v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991) ("[A] state-issued license for the continued pursuit of the licensee's livelihood, renewable periodically on the payment of a fee and revocable only for cause, creates a property interest in the licensee.").

Further, "[t]he rights to sell, assign, or otherwise transfer are traditional hallmarks of property." *Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002), citing *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419 (1982)). It is undisputed that a casino gaming licensee in Arkansas may "sell, transfer, or otherwise dispose of its license to another person or entity who demonstrates casino gaming experience" with approval from the ARC. *See* Casino Gaming Rule 2.13.16. In fact, in the short time casino gaming has been authorized in Arkansas, Saracen has already transferred its interest.

The Defendants' assertion that "CNE's interest in the Pope County casino license stems from its unilateral expectation" is false. Defendants' Brief in Support of Defendants' Motion to Dismiss First Amended Complaint, p. 7. That is at odds with the testimony of the Defendants. Can

the Defendants state affirmatively that Oaklawn, Saracen, and Southland only have unilateral expectations to keep and renew their licenses? No. Can the Defendants state affirmatively that Oaklawn, Saracen, and Southland only have unilateral expectations that they can transfer their licenses or the interests therein? No, and there is adequate proof behind that statement. Saracen, despite being a newly formed entity with arguably no casino gaming experience itself, received its license via transfer. The ownership interest in Oaklawn has been modified over the years. The Commissioners' testimony will establish all of these facts.

The bottom line is that an expectation formed in reliance upon the Arkansas Constitution is not unilateral. The Arkansas Constitution is the supreme governing document for our State, and Amendment 100 was adopted by the electorate of our State. There is nothing unilateral about that. Amendment 100 has specific provisions that restrict official discretion and establish a protectable property right in a casino gaming license:

- Amendment 100 states that the ARC "**shall** issue four casino licenses." Ark. Const. Amend. 100, § 4(i) (emphasis added).

- Amendment 100 only allows the suspension or revocation of a casino gaming license if a licensee violates Amendment 100 or the Casino Gaming Rules, assuming there are procedures in place. Ark. Const. Amend. 100, § 4(e)(8). Specifically, this provision states that the ARC shall adopt rules setting forth the "[p]rocedures for suspending or terminating casino licenses held by casino licensees that violate the provisions of this Amendment or the rules adopted under this Amendment." As set forth below, the Casino Gaming Rules do not have procedures for suspending or revoking a casino gaming license.

- Amendment 100 leaves no discretion regarding license renewal: "The Arkansas Racing Commission **shall** issue a renewal casino license within ten days to any licensed casino

that complies with the requirements contained in this Amendment, including without limitation the payment of the casino license renewal fee, which shall not exceed $10,000. Casino licenses **shall** be renewed every ten years." Ark. Const. Amend. 100, § 4(q) (emphasis added).

- Amendment 100 expressly contemplates a licensee transferring the license to another entity. Ark. Const. Amend. 100, § 4(e)(12); Casino Gaming Rule 2.13.16.

- Amendment 100 provides that "[c]asino licensees are required to conduct casino gaming for as long as they have a license." Ark. Const. Amend. 100, § 4(l).

- Amendment 100, § 4(d) also provides that "Rules adopted under this section are rules as defined in the Arkansas Administrative Procedures Act, Ark. Code Ann. § 25-15-201 et seq." Thus, Amendment 100 expressly invokes the Administrative Procedures Act. The Administrative Procedures Act leaves no doubt that CNE's gaming license is a protectable property interest:

- Ark. Code Ann. § 25-15-211(c) states in regard to negative actions against a license: "No revocation, suspension, annulment, or withdrawal of any license is lawful unless the agency gives notice by mail to the licensee of facts or conduct warranting the intended action and unless the licensee is given an opportunity to show compliance with all lawful requirements for the retention of the license." Here, CNE was not allowed an opportunity to show compliance with all lawful requirements. It was not even identified in Amendment 104.

- Ark. Code Ann. § 25-15-211(b) addresses renewals and places limitations on the effects of a denial of renewal: "When a licensee has made timely and sufficient application for the renewal of a license or a new license with reference to any activity of a continuing nature, the existing license shall not expire until the application has been finally determined by the

agency and, in case the application is denied or the terms of the new license limited, until the last day for seeking review of the agency order, or a later date fixed by order of the reviewing court."

Moreover, the Casino Gaming Rules place substantial limitations on government interference with a casino gaming license:

- The Casino Gaming Rules create a process for transferring/selling a casino gaming license. Casino Gaming Rule 2.13.16.

- The Casino Gaming Rules address renewals: "The Commission may deny an application for or renewal of a license for any of the following reasons: (i) Failure to provide the information required in these Rules; (ii) Failure to meet the requirements set forth in these Rules; (iii) Providing misleading, incorrect, false, or fraudulent information with the intent to deceive." Casino Gaming Rule 2.13.12(a). With these provisions, the ARC leaves itself no discretion to deny renewal if these three boxes are checked, and these boxes are objective criteria.

- The Casino Gaming Rules invoke the Administrative Procedures Act and give the licensee a right to a hearing in front of the commission (and thereafter to the Circuit Court) after a denial of renewal, transfer of ownership, and transfer of location. Casino Gaming Rule 2.13.18.

- The Casino Gaming Rules do not include a procedure for revoking or suspending a license.

- Casino Gaming Rule 4.030 authorizes the revocation of a license only if the licensee violates Amendment 100 or the Casino Gaming Rules.

These procedural requirements operate as significant and substantive restrictions on the government. Thus, Amendment 100 and the relevant Casino Gaming Rules and Arkansas Code are

34

clear and create more than a unilateral expectation in their express provisions regarding renewal and protection of a casino gaming license (Defendants' testimony renders this undisputed). To the extent there is any ambiguity, which there is not, the intent of a drafter can aid in construing Amendment 100. *Bishop v. Linkway Stores, Inc.*, 280 Ark. 106, 109 655 S.W.2d 426, 428-29 (1983). David Couch was a drafter of Amendment 100 and will testify that it was drafted with the intent that casino licenses be permanent. For these reasons, a protectable property right exists.

**5.  Casino Gaming Rule 4.040 Is Not Applicable and Conflicts with Amendment 100**

Amendment 100 provides the ARC with many regulatory powers, but declaring whether a license is a property interest or privilege is not one of them. There is no dispute that the ARC could not act arbitrarily or capriciously or without notice in taking negative action against licenses and licensees, which is the protection guaranteed by substantive due process rights. *See* Transcript of November 12, 2024 Hearing, p. 77 (conceding there must be process before ARC take away a license); *see also id.* at 43-44 (this Court agreeing that the ARC cannot arbitrarily revoke a license); *see also id.* at 96, 107 (this Court agreeing that there is a deep unfairness at issue); *Lewis*, 523 U.S. at 845-46. These restrictions establish a protectable property interest. Defendants have attempted to offer Casino Gaming Rule 4.040, which alleges a casino license is a revocable privilege, to push back against Plaintiffs' property interest. However, Casino Gaming Rule 4.040 conflicts with Amendment 100, and as a constitutional amendment, the language of Amendment 100 controls. Furthermore, the Commissioners' testimony will also establish that CNE had a legitimate expectation to retain its license if in compliance with Amendment 100 and the Casino Gaming Rules.

This is also consistent with another principle: "Merely calling a [] license a privilege does not free the municipal authorities from the due process requirements in licensing and allow them

to exercise an uncontrolled discretion." *Hornsby v. Allen*, 326 F.2d 605, 609 (5th Cir. 1964); *see also Phila. Ent. and Dev. Partners., L.P. v. Penn. Gaming Control Bd.*, 34 A.3d 261 (Pa. Cmwlth. 2011); *Roth*, 408 U.S. at 571-72. Moreso where Amendment 100 controls. Amendment 100 never describes the license as a privilege nor gives the ARC free rein in license termination, renewal, or transfer. As set forth above, Amendment 100, the Administrative Procedure Act, and the Casino Gaming Rules limit the ARC's discretion to revoke a license or deny license renewal or transfer and require notice and hearing for any negative action. These are hallmark signs of a property right.

Further, any argument that the ARC can revoke a license without notice, a hearing, and for whatever reason would be in violation of its own rules (for example, 4.030) and would be an unlawful additional qualification or requirement prohibited by Arkansas law. Arkansas case law is clear that an agency rule must yield to the Arkansas Constitution. *Monsanto Company v. Arkansas State Plant Board*, 2021 Ark. 103, 622 S.W.3d 166. Case law is also clear that when the Arkansas Constitution prescribes qualifications and requirements in detail, additions to or deletions from those are not permitted. *See Landers v. Stone*, 2016 Ark. 272, 7-8, 496 S.W.3d 370, 376 ("It is beyond dispute that the General Assembly does not have the authority to impose qualifications for judicial office in addition to those set out in the constitution."); *Martin v. Kohls*, 2014 Ark. 427, 14-15, 444 S.W.3d 844, 852-53 ("Therefore, we hold that Act 595 requiring proof of identity is unconstitutional on its face and imposes a requirement that falls outside the ambit of article 3, section 1, of the Arkansas Constitution."); *U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 265, 872 S.W.2d 349, 356 (1994), aff'd sub nom. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ("Qualifications set out in the U.S. Constitution, unalterable except by amendment to that document, is a conclusion that makes eminently good sense."); *Mississippi County v. Green*, 200

Ark. 204, 138 S.W.2d 377, 379 (1940) ("[W]here the constitution itself prescribes in detail the qualifications for office, the legislature may not add to or diminish them."). Arkansas law is clear: notice and a hearing are required before revocation.

Here, Amendment 100 clearly prescribes protections and qualifications for a casino gaming license, specifically the ten year term and renewal. Because Amendment 100 set out in detail protections for licensees and restrictions on the ARC's discretion, the ARC is prohibited from adding or removing those. Stated simply, an agency rule cannot trump the Arkansas Constitution, and it has been established that a license cannot be revoked arbitrarily or without notice. Thus, CNE's casino gaming license constitutes a protectable property interest.

### 6. Arkansas Liquor License Cases Are Not Applicable

The State cites two cases, the most recent case being from 1944, on liquor licenses in support of its argument that CNE has no vested property interest in its license. But these cases miss the mark. Liquor licenses are creatures of statute, and the Arkansas General Assembly has declared that "[i]t is the specifically declared policy of the General Assembly that all licenses issued to establishments for the sale or dispensing of alcoholic beverages are privilege licenses, and the holder of such privilege license is to be held to a high duty of care in the operation of the licensed establishment." Ark. Code Ann. §§ 3-3-218 (adopted as early as Act 695 of 1989). Amendment 100, which created casino licenses, says no such thing. And as set forth in other sections herein, the Arkansas Code and case law specifically find that public policy is in favor of gaming.

Contrary to liquor licenses, protections afforded to casino gaming licensees are much greater.[2] The Arkansas Constitution expressly provides protections to casino gaming license holders but not liquor license holders. The Arkansas Constitution does not mandate a ten-year license period for liquor licenses. It does not mandate renewal of a liquor license after that ten-years if objective criteria are satisfied. It does not expressly allow transfer of a liquor license. Amendment 100 expressly provides these protections to casino gaming licensees. It also expressly allows casino gaming licensees to sell intoxicating liquor, providing casino gaming licensees with more rights to sell liquor than the liquor licensees themselves. Unlike liquor licenses, Amendment 100 allows casino gaming licensees to sell liquor on Christmas Day and exempts the licensee from "Ark. Code Ann. § 3-9-201, et seq. and other applicable Arkansas law requiring the residents of a dry county or city to vote to approve the sale of intoxicating liquor." Ark. Const. Amend. 100, § 7(b). And as set forth above, Amendment 100, the Arkansas Administrative Procedures Act, and the Casino Gaming Rules all work to restrict negative action that can be taken by the ARC against a license holder.

### 7. Arkansas Public Policy Supports a Protectable Property Interest

The express public policy of the State of Arkansas supports a protectable property interest. Revocation of the Pope County casino license will cause "Arkansans [to] travel to adjoining states in order to wager at legal gambling establishments in those states. This adversely impacts Arkansas

---

[2]     It is important to note that since the 1944 case cited by Defendants, Arkansas has enacted statutes requiring notice and a hearing before revocation of a liquor license. Ark. Code Ann. §§ 3-2-212 and 213. Thus, the State of Arkansas expressly provides due process to liquor licensees.

tourism and results in certain economic activity leaving Arkansas for the benefit of adjoining states." Ark. Code Ann. § 23-113-101(a)(4).

The Choctaw Nation itself estimates that Arkansans spend $12,000,000.00 annually at its establishment alone. This is consistent with the expert opinion of Cory Morowitz. "Wagering" is "considered to be vital to the state and local economies." *Gallas v. Alexander*, 371 Ark. 106, 127, 263 S.W.3d 494, 510 (2007). Further, electronic games of skill are still authorized in the State of Arkansas at any place of horse or dog racing (not to exceed one per county). Ark. Const. Amend. 100, § 9. Although there are only two counties that have utilized this method in the past, there is nothing that prevents the creation of such an establishment in every single county in Arkansas. *Gallas v. Alexander*, 371 Ark. at 127, 263 S.W.3d at 510. And no negative actions have ever been taken against the operators of electronic games of skill. Therefore, Amendment 104's revocation of CNE's casino license is in direct conflict with historic policy of the State of Arkansas.

### C. Amendment 104 Violated Plaintiffs' Procedural Due Process Rights

#### 1. Amendment 104 Unlawfully Targeted CNE's Casino Gaming License

"[L]egislative action of general applicability" may pass constitutional standards. *37712, Inc. v. Ohio Dept. of Liquor Control*, 113 F.3d 614, 619 (6th Cir. 1997) (citing *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244-45 (1973) (emphasis added)). However, due process is violated when a voter initiative, instead of being of general applicability, specifically targets a license-holder. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915). In other words, a "targeted referendum" violates due process rights. *N & N Catering Co., Inc. v. City of Chicago*, 26 F. Supp. 2d 1067, 1079 (N.D. Ill. 1998) (granting liquor license holder's request for preliminary injunction) (citing *Marusic Liquors, Inc. v. Daley*, 55 F.3d 258 (7th Cir. 1995)); *see also Club Misty, Inc.*, 208 F.3d 615 (7th Cir. 2000); *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710

(6th Cir. 1991) (abrogated on other grounds); *Colson v. City of Shaker Heights*, 880 F.Supp. 1161, 1166 (N.D. Ohio 1995) (finding that the "law at issue here contains none of the evils which made the statute at issue in *Brookpark* unconstitutional. [The statutes] do not permit the voters to revoke a liquor license; they merely allow the voters to prohibit particular kinds of liquor sales within their district. The Lounge could still use its liquor license at another location outside the "dry" precinct."). "[W]hen voters pointedly single out a particular licensee, and do not target other licensees in the same precinct," the conduct is "capricious" and procedural due process is violated. *87 South Rothschild Liquor Mart v. Kozubowski*, 752 F.Supp. 839, 842 (N.D. Ill. 1990).

The Defendants, at the November 12, 2024 hearing, argued that Amendment 104 was generally applicable because "[n]o one in Pope County can have a license anymore. So it's not just as if it's to them specifically . . . but it's to all of Pope County." Transcript of November 12, 2024 Hearing, p. 81. The argument that Amendment 104 is generally applicable because it applies to all of Pope County is nonsensical. A rule is generally applicable only if it treats all regulated parties similarly. *Cf. Fulton v. City of Phila.*, 593 U.S. 522, 534 (2021). But Amendment 104 does not— it singles out Pope County and CNE for special disfavored treatment that it does not inflict on other counties. And it is not generally applicable just because it treats all Pope County residents equally to one another. A state may not escape constitutional scrutiny just by saying it treats all those it disfavors equally to other disfavored parties—the question is how it treats them relative to *non*disfavored parties. *Cf. id*.

Issue 2 was a targeted referendum and violated CNE's due process rights. These cases negate any argument that the election itself was enough to satisfy due process standards. And CNE

did not even have the opportunity to be heard, as due process would have required, because nothing in Amendment 104 identifies CNE.

Importantly, none of the cases cited by the Defendants regarding legislative or adjudicative functions dealt with the revocation of a license, much less one issued pursuant to a state's constitution. Defendants rely heavily on *Foster v. Hughes*, 979 F.2d 130, 132 (8th Cir. 1992) and *Leapheart v. Williamson*, 705 F.3d 310 (8th Cir. 2013), but the facts of those cases are distinguishable. *Foster* dealt with inmates' claims that Missouri arbitrarily denied them the right to place their money in private, interest-bearing accounts. Missouri did not arbitrarily select just one of the inmates and restrict his ability to place money in a private, interest-bearing account. The Court opined: "Persons are entitled to procedural due process, in the form of an individual opportunity to be heard, only when the government makes an individualized determination, **not when the government commits a legislative act equally affecting all those similarly situated.**" *Id.* at 132 (emphasis added). It is undisputed that the State of Arkansas did not commit a legislative act equally affecting all similarly situated. Oaklawn, Saracen, and Southland still have their casino gaming licenses. The Defendants may assert that other entities, like Gulfside Casino Partnership and other unsuccessful applicants, were "equally affected." But these entities were not similarly situated, in that they were never qualified to hold the license and did not hold the license at the time Amendment 104 was enacted. And *Leapheart*, a case involving legislative immunity for employment suits against city officials, simply has nothing to do with this claim.

## 2. Amendment 104, Along with the Ballot Title and Popular Name, Denied Plaintiffs A Meaningful Opportunity to Be Heard

"For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be noticed." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quotation marks

omitted). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Grannis v. Ordean*, 234 U.S. 385, 394 (1914). CNE was not given proper notice and was not given an opportunity to be heard at a meaningful time and in a meaningful manner.

The State makes the following argument for sufficiency of due process: "In sum, CNE was not entitled to an individualized hearing. It was entitled to participate in the election and an opportunity to campaign against the proposition that no casino license **should be issued** to any person or entity in Pope County. CNE fully exercised that right." Defendants' Brief in Support, p. 11 (emphasis added). The State continues to be mistaken in its own interpretation of Amendment 104. "The proposition" was not that "no casino license **should be issued** to any person or entity in Pope County." That is prospective language, failing to acknowledge that CNE possessed the casino gaming license. The Amendment revoked CNE's license. It did not merely prohibit the future issuance of a gaming license in Pope County.

The initiative and referendum procedure, specifically Title VII of the Arkansas Code and Ark. Const. Amend. 7, failed to provide a mechanism where CNE and voters, including Plaintiff Jennifer McGill, would both have notice of the revocation of a property interest, including the casino gaming license and the EDA. Specifically, Amendment 7 and Arkansas statutes do not contain any provision that would have authorized the amendment of the popular name, ballot title and Proposed Amendment after CNE received its casino gaming license on June 27, 2024, to include notice that the Proposed Amendment would revoke CNE's casino gaming license. Nothing in Amendment 104, the popular name, or ballot title stated that a license had been issued, to whom it had been issued, or that an EDA was in effect. To put it simply, the voters had no idea, by looking at what was in front of them in the voting booth or even looking at the text of Amendment 104,

that they were revoking CNE's license or nullifying a government contract. Due to this, CNE was not afforded a meaningful opportunity to defend its license despite being in full compliance with Amendment 100 and the Casino Gaming Rules.

Similarly, due process requires "voters [to] not be misled to the extent they do not know what they are voting for or against." *Egan Slough Cmty. v. Flathead Cnty. Bd. of Cnty. Comm'rs*, 506 P.3d 996, 1015 (Mont. 2022), quoting *State ex rel. Mont. Citizens for Pres. of Citizen's Rights v. Waltermire*, 738 P.2d 1255, 1258 (Mont. 1987); *see also Kohler v. Tugwell*, 292 F.Supp. 978 (E.D. La. 1968). There is no question that the voters, including Plaintiff Jennifer McGill, did not and could not know, by reading the text of Amendment 104, or the popular name and ballot title, that they were revoking CNE's casino license. This confusion was not just a result of the absence of language in Amendment 104, but also because of misleading advertisements coordinated and paid for by the proponents of Amendment 104. The confusion and falsehoods that misled voters occurred up to November 5, 2024, a period that falls well after the certification and was not (and temporally could not) be evaluated by the Arkansas Supreme Court. The Arkansas Supreme Court only reviewed the ballot title and popular name to ensure they accurately described Amendment 104, nothing else.

CNE was not afforded an adequate opportunity to participate when Amendment 104 did not even mention CNE. Could the ARC, or any agency for that matter, provide notice of a hearing to revoke a license without giving notice or naming the licensee to be affected? Of course not. That is precisely what Amendment 104 did. Amendment 104 did not put any voter on notice that it was revoking CNE's license. Can you review Amendment 104 and know with certainty that CNE's casino gaming license was revoked? Not only is the answer to that question an unequivocal no, but you cannot review Amendment 104 and know by its text that any casino gaming license was

revoked. And the actions by the proponents only furthered this confusion, culminating in CNE having no meaningful opportunity to defend its license.

### D. CNE's Substantive Due Process Rights Were Violated

Amendment 104's targeted, singular license revocation was arbitrary and capricious, and thus in violation of CNE's substantive due process rights. To establish a claim for violation of substantive due process, a plaintiff must show that the government action was arbitrary and capricious. *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). An action violates substantive due process if it is irrational or violates judicial notions of fairness. *Draper v. City of Festus, Mo.*, 782 F.3d 948, 953. The abrogation of CNE's property rights was arbitrary, served no public purpose, and solely benefitted an out-of-state entity, specifically Choctaw Nation, the primary beneficiary and backer of LVC. This Court acknowledged the deep unfairness at play in this matter. Transcript of November 12, 2024 Hearing, p. 96, 107.

As previously noted, there is no state interest in preventing gaming in only one Arkansas county, when doing so would inure solely to the benefit of out of state business entities that are the economic rivals of the disadvantaged firm. *Supra* pp. 22-23. The deeply unfair manner in which the Pope County casino license was revoked and contracts abrogated—by an amendment helmed by an out-of-state business rival and out-of-state paid canvassing companies—shocks the conscience and otherwise offends judicial notions of fairness. Looking specifically at voter initiative and referendum, if a referendum result is substantively "arbitrary and capricious, bearing no relation to the police power," the result is judicially voidable as impinging substantive due process guarantees. *Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 676 (1976); *see Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir.1988) (resolving that substantive due process safeguards prevent "arbitrary and capricious" government action which deprives a person of a property or

liberty interest). Further, a "targeting" referendum violates a licensee's substantive due process rights. *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710 (6th Cir. 1991).

Defendants argue that there is nothing "conscience shocking" because the "majority of the electorate [] decided that we should get rid of this. . . ." Transcript of November 12, 2024 Hearing, p. 96. But in addition to targeting, Amendment 104 did not disclose to the electorate that it was revoking CNE's license, which is inherently unfair. The targeted revocation of CNE's license was not based upon police power, as the public interest is not served by revoking a license without adequately disclosing to the public who the license holder is. Rather, Amendment 104 constitutes arbitrary targeting of CNE in violation of CNE's substantive due process rights.

### E. *Amendment 104 Violates the Takings Clause of the United States Constitution*

As set forth above, CNE and CNB had protectable property interests in the casino gaming license and in their contracts with various entities, including the EDA with Pope County. Because CNE has a property right in its license and its contracts, Amendment 104 constitutes a taking of those property rights. CNB and CNE also have substantial property interests in real property, including but not limited to real property located in Pope County, Arkansas, and this real property will be substantially diminished by Amendment 104. CNB and CNE purchased substantial acreage in Pope County, Arkansas as the site for the casino operations. This land was annexed into the City of Russellville, Arkansas by vote of the people on November 5, 2024, pursuant to Ordinance No. 2493. CNE and CNB did not oppose the annexation of its property into the City of Russellville.

Importantly, nothing in the text of the Amendment gives any indication that the taking of property will be for "public use." The abrogation of CNE's property rights was arbitrary, served no public purpose, and solely benefitted an out-of-state entity, specifically the primary beneficiary and backer of LVC, the Choctaw Nation. Taking property that is not for public use is strictly

prohibited. *Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005). Thus, as there was no "public use" to justify the taking, CNE is entitled to injunctive relief for taking its property.

The Eleventh Amendment does not apply to a claim under the Takings Clause because the State of Arkansas does not allow for adjudication of such claims in its courts. Ark. Code Ann. § 19-10-204 (a) states that "[t]he Arkansas State Claims Commission has jurisdiction over: (1) A claim or action that is barred by the doctrine of sovereign immunity under Arkansas Constitution, Article 5, § 20, from being litigated in a court of general jurisdiction, except as otherwise provided by law." Thus, any civil rights action against the State of Arkansas must be brought before the Arkansas Claims Commission. There is no opportunity for redress in the Arkansas courts.

"A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it . . . and therefore may bring his claim in federal court under § 1983 at that time." *Knick v. Township of Scott, Penn.*, 588 U.S. 180, 185 (2019). If this were not clear enough, several circuits have held that a claim under the Takings Clause is barred by Eleventh Amendment immunity only if a remedy is available in state court. *See Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014) (concluding "that the Eleventh Amendment bars Fifth Amendment taking claims against States in federal court when the State's courts remain open to adjudicate such claims"); *Jachetta v. United States*, 653 F.3d 898, 909-10 (9th Cir. 2011) (holding the Eleventh Amendment bars claims brought against the state in federal court under the federal Takings Clause, but state courts must be available to adjudicate such claims); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 526-28 (6th Cir. 2004) (holding Eleventh Amendment immunity barred federal takings claim; stating state court "would have had to hear that federal claim"), overruled on other grounds by *San Remo Hotel, L.P. v. City & Cty. of San Francisco*, 545 U.S. 323 (2005); *see also John G. & Marie Stella Kenedy Mem'l Found. v. Mauro*, 21 F.3d 667, 674 (5th Cir. 1994) (holding "Fifth

Amendment inverse condemnation claim brought directly against the State of Texas [was] barred by the Eleventh Amendment"); *Robinson v. Ga. Dep't of Transp.*, 966 F.2d 637, 638, 640-41 (11th Cir. 1992) (holding Eleventh Amendment barred plaintiffs' claim "for violation of the Fifth and Fourteenth Amendments for a taking of their property"); *Garrett v. Illinois*, 612 F.2d 1038, 1039-40 (7th Cir. 1980) (holding Fifth Amendment takings claim against the state based on plaintiff's inability to earn income while incarcerated was barred by the Eleventh Amendment). Here, a remedy is not afforded in the courts of the State of Arkansas. Thus, a takings claim against the State of Arkansas is not barred by the Eleventh Amendment.

### F.  Amendment 104 Violates the Equal Protection Clause of the United States Constitution

Equal protection under the law is guaranteed by the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. XIV, § 2. "The Equal Protection Clause keeps governmental decisionmakers from treating disparately persons who are in all relevant respects similarly situated." *Bills v. Dahm*, 32 F.3d 333, 335 (8th Cir. 1994). Injunctive relief, including a temporary restraining order, is an appropriate and available measure of relief for a violation of the Equal Protection Clause. *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638 (N.D. Tex. 2021); *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994 (8th Cir. 2019) (finding that equal protection claim supported preliminary injunction). The United States Supreme Court has held that "discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Romer v. Evans*, 517 U.S. 620, 633 (1996), quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37–38 (1928). Elimination of casino gaming in Pope County by an initiative exclusively funded by an out-of-state competitor is certainly unusual and demands careful review.

Amendment 100 required the issuance of four licenses; before the enactment of Amendment 104, there were four license holders, including CNE. Undoubtedly all four license holders are similarly situated in all relevant respects and share indistinguishable interests in their rights and status as license holders. The Amendment treats CNE differently from the other license holders because it arbitrarily targets and revokes CNE's Pope County casino license while leaving valid the casino licenses in Crittenden, Jefferson, and Garland Counties. Equal protection requires that if distinctions between similarly situated persons do exist, the distinctions must have "relevance to the purpose for which classification was made," and must not be "so disparate as to be arbitrary." *See Akers v. State*, 464 S.W.3d 483 (Ark. App. 2015).

The intentionally targeted nature of Amendment 104 establishes a class-of-one equal protection claim. *Higgins Electric, Inc. v. O'Fallon Fire Protection Dist.*, 813 F.3d 1124, 1129 (8th Cir. 2016) (setting forth the standard for class-of-one equal protection claim); *Village of Willowbrook v. Olech*, 528 U.S. 652, 654 (2000). Amendment 104 constitutes a vindictive-action equal protection violation resulting from a campaign to repeal CNE's casino gaming license motivated by economic anti-competitive malice. The differential treatment was caused by illegitimate animus, including the Choctaw Nation's desire to protect its financial interests—not a legitimate concern of the State of Arkansas. *Olech v. Village of Willowbrook*, 160 F.3d 386 (7th Cir. 1998); *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995).

The disparate treatment resulting from the illegitimate animus has no relationship to a rational governmental objective. Defendants, through the Attorney General, could not even explain Amendment 104's consequences at the November hearing, much less the rational basis for the Amendment. Counsel for LVC has admitted the intent was to specifically target the Pope County casino license. *See, e.g.*, LVC's Brief in Support of Motion to Intervene, p. 1; Transcript of

November 12, 2024 Hearing, p. 28 (Counsel stated: "And the object of all of those was to remove the designation of Pope County having a casino."). There is no rational governmental objective served by targeting and eliminating casino gaming in Pope County for the benefit of an out-of-state competitor while allowing it to continue in three other counties. The Amendment also imposes disparate treatment by affecting and interfering with CNE's contracts, while having no impact on the other licensees' contractual relationships. The Amendment fails to give any reason for revoking one license but leaving three licenses remaining.

Defendants advance two putative purposes or intentions of the Amendment: (1) placing the establishment of casinos under the "local control" of the voters in each county (the reason touted by the proponents during the campaign) and (2) curbing gaming in Arkansas (a new theory aired for the first time after this case was filed). Neither is plausible.

As an initial observation, the two asserted rationales are not harmonious. The policy promoted by LVC, that there should be *local* control over the decision of whether casino gambling should be allowed in a county, on the one hand, and Amendment 104's establishment of a *statewide* policy to "curb" gaming by revoking an existing casino license in a specific county without any local vote or say in the revocation, on the other, are obviously inconsistent. Apart from the irreconcilable conflict between the two policies, however, the obvious purpose and effect of the Amendment—targeting one license—belies any of the rationales proffered by Defendants.

Amendment 104's purported policy of *local* control—delegating to county voters the authority to decide whether gaming should be allowed within their county—fails to square up with the provision in Amendment 104 that automatically revokes the existing casino license for Pope County without any local vote or say on that question. The actual effect of the revocation provision in Amendment 104 is the *opposite* of local control. The so-called local control policy is even

further undermined by the language of Amendment 104 that prevents local voters from deciding whether gaming in that county should be allowed unless the Arkansas Constitution is amended yet again (through another *statewide* referendum) to allow them to even entertain the question. While the LVC may have managed to cloak Amendment 104 in the rhetoric of local control, there is really nothing of substance in the amendment that advances a policy of local control. To the contrary, the upshot and design of Amendment 104 is the revocation of a single license—CNE's Pope County casino license—through a statewide election that leaves all other existing casino licenses in effect and untouched, together with a "belt and suspenders" provision that makes it impossible for CNE to obtain another Pope County casino license absent another amendment to the Arkansas Constitution. Under Amendment 104, local voters are in charge of nothing that has anything to do with casinos or casino licenses unless there is another state-wide election that grants them permission to have some say on that issue.

Instead, Amendment 104's purpose is to target one license. A "class of one" equal protection claim exists where the plaintiff has been intentionally treated differently from others similarly situated, without any rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Thus, the intent and purpose of the challenged measure is significant. When the action in question is the result of a voter initiative, courts focus on the scope and effect of the measure, viewed in its historical background and context. *See, e.g.*, *Schuette v. Coalition to Defend Affirmative Action, Integration and Immigrant Rights and Fight for Equality by Any Means Necessary*, 572 U.S. 291, 313-314 (2014) (observing that cases interfering with initiative measures on equal protection grounds because of racial discrimination have been "ones in which the political restriction in question was *designed* to be used, *or likely to be used*, to encourage infliction of injury because of race." (emphasis added)).

*Coalition to Defend Affirmative Action, Integration and Immigrant Rights and Fight for Equality by Any Means Necessary*, 572 U.S. 291, 313-314 (2014) (observing that cases interfering with initiative measures on equal protection grounds because of racial discrimination have been "ones in which the political restriction in question was *designed* to be used, *or likely to be used*, to encourage infliction of injury because of race." (emphasis added)).

Thus, in *Reitman v. Mulkey*, 387 U.S. 369 (1967), the Supreme Court looked to a ballot proposition's "immediate objective," "ultimate effect" and "historical context" to inform its analysis of the "purpose, scope, and operative effect" of the amendment, and thereby determine its intent for equal protection purposes. *Id*. at 373-74. The Court concluded that the purpose of the measure was to overturn state laws that inhibited the right of private sellers and lessors to discriminate. *Id.*

Likewise with *Hunter v. Erickson*, 393 U.S. 385 (1969), in which the Akron, Ohio city council passed an ordinance prohibiting discrimination in housing.  In response, the voters approved an initiative measure that amended the city charter to prohibit the council from implementing any such ordinances without the approval of a majority of the city's voters— essentially an "automatic referendum" requirement.  In considering an equal protection challenge to the constitutionality of this initiative, the Court said, "It is against this background that the referendum required by §37 must be assessed."  393 U.S. at 391.  The proffered justifications for the measure were that it was intended simply to "move slowly" in the sensitive area of race relations (similar to the "curbing gaming in Arkansas" rationale in this case), and to give the people an opportunity to participate in the decision (similar to the "local control" argument).  Looking at the scope and effect of the initiative measure, the Court stated that it was "unimpressed" by these

rationales, and observed that the terms of the initiative were unnecessary to achieve either purpose. 393 U.S. at 392.

A similar analysis was applied in *Romer v. Evans*, 517 U.S. 620 (1996). In that case, after an ordinance was enacted barring discrimination on the basis of sexual orientation, the people of the State of Colorado approved an initiative measure amending the state constitution to repeal such measures. The initiative also prohibited any government action of any kind designed to prohibit sexual-orientation discrimination, and stated that no provision that gave protected status to homosexual persons could be enacted unless allowed by a future constitutional amendment. The Supreme Court held this measure to be unconstitutional, rejecting as "implausible" the State's argument that the only thing the measure did was deny homosexual persons "special" rights. 517 U.S. at 626. It based its conclusion as to the discriminatory intent of the measure on the fact that its breadth was so discontinuous with the reason proffered for it that it seemed inexplicable by anything other than animus toward the affected class. 517 U.S. at 632.

In this case, it has already been described at length, above, that what Amendment 104 actually *did* has no rational relation to the rationales proffered by Defendants, and indeed is inconsistent with and even antagonistic to those rationales. For instance, it is fantastical to imagine that stripping Pope County of CNE's casino license without asking the voters of that county what they wanted, and requiring a statewide vote before any future license can be issued in Pope County or anywhere else, could in any way foster the ideal of "local control". And the idea of "curbing gambling in Arkansas" is likewise unavailing. First, curbing gaming is not in fact a public policy of the State of Arkansas; quite the contrary. Ark. Code Ann. § 23-113-101(a)(4); *Gallas v. Alexander*, 371 Ark. 106, 127, 263 S.W.3d 494, 510 (2007). Second, shutting down the prospect of a casino in Pope County will not in fact curb gaming by Arkansas residents; it will simply

redirect those who would otherwise patronize a Pope County casino (along with their $12 million a year) into the waiting arms of the Choctaw Nation casino in Oklahoma or redirect them to other casinos (in and out of state) and online sports betting through the other three casinos in the state.

This disconnect between the scope and the operative effect of Amendment 104 and the rationales advanced by the Defendants is so painfully obvious that the Amendment seems inexplicable by anything other than the anti-competitive intent of its sponsors, the Choctaw Nation and its compatriots. *Romer*, 517 U.S. at 632. There is "little doubt" that Amendment 104 was "carefully tailored" to eliminate CNE's Pope County casino license. *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 471 (1982) (discussing the purpose of the promoters of an initiative measure). As such, Amendment 104 is a classic example of an unconstitutional "class of one" discriminatory measure that targets an individual for disparate treatment without any legitimate governmental rationale. Amendment 104 offends the Equal Protection Clause and should be invalidated.

### G.  Amendment 104 Constitutes a Bill of Attainder

The United States Constitution provides that: "No State shall ... pass any Bill of Attainder." U.S. Const. art. I, § 10, cl. 1. The revocation of a license can constitute a bill of attainder. *Davis v. City of Kinloch*, 752 S.W.2d 420 (Mo. Ct. App. 1988), citing *Crain v. City of Mountain Home, Arkansas*, 611 F.2d 726, 729 (8th Cir. 1979) ("[L]egislation which inflicts a deprivation on named or described persons or groups constitutes a bill of attainder whether its aim is retributive, punishing past acts, or preventive, as in this case, discouraging future conduct."). Amendment 104 targets and punishes CNE while not affecting any other license or licensee in the State of Arkansas. Amendment 104 revoked only CNE's casino gaming license and destroyed only contracts of CNE

and CNB. Thus, CNE was the "easily ascertainable" target of Amendment 104. *United States v. Brown*, 381 U.S. 437, 448–49 (1965).

There are three necessary inquiries regarding whether a law inflicts forbidden punishment, and is thus a bill of attainder: an historical test, a functional test, and a motivational test. *WMX Technologies, Inc. v. Gasconade County, Mo.*, 105 F.3d 1195, 1202 (8th Cir. 1997), citing *Nixon v. Administrator of General Services*, 433 U.S. 425, 473-78 (1977); *see also Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 847 (1984). Amendment 104 inflicts forbidden punishment under the historical test by targeting and "permanently confiscating" property of Plaintiffs. *Id.*, *see also Pempek v. Edgar*, 603 F.Supp. 495, 502 (N.D. Ill. 1984); *Fletcher v. Peck*, 10 U.S. 87 (1810); *Consolidated Edison Co. of New York, Inc. v. Pataki*, 292 F.3d 338 (7th Cir. 2002); *Cummings v. Missouri*, 71 U.S. 277 (1866) (stating "the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed."). There is nothing CNE or CNB can do to regain its property. In other words, they do not "carry the keys of their prison in their own pockets." *Shillitani v. United States*, 384 U.S. 364, 368 (1966). Moreover, Amendment 104 has the effect of revoking CNE's casino license, rendering unlawful any gaming activities that CNE would have carried out under the license. Due to Amendment 104, those same activities would be prohibited by the criminal laws of Arkansas. *See* Ark. Code Ann. § 5-66-103.

Further, Amendment 104 does not pass the functional test. To pass that test, a law must be rational, fair, and have a nonpunitive purpose. "[T]he nonpunitive aims must be sufficiently clear and convincing before a court will uphold a disputed statute against a bill of attainder challenge." *Foretich v. U.S.*, 351 F.3d 1198, 1220-21 (D.C. Cir. 2003). "Courts have conducted this inquiry by

examining both the purported ends of contested legislation and the means employed to achieve those ends." *Id.* at 1221. Because "an imbalance [between burden and nonpunitive purpose] belies any purported nonpunitive goals, the availability of 'less burdensome alternatives' becomes relevant to the bill of attainder analysis." *Id.* at 1222, citing *Nixon*, 433 U.S. at 482 ("In determining whether a legislature sought to inflict punishment on an individual, it is often useful to inquire into the existence of less burdensome alternatives by which that legislature ... could have achieved its legitimate nonpunitive objectives.") "It is not the severity of a statutory burden in absolute terms that demonstrates punitiveness so much as the magnitude of the burden relative to the purported nonpunitive purposes of the statute. A grave imbalance or disproportion between the burden and the purported nonpunitive purpose suggests punitiveness, even where the statute bears some minimal relation to nonpunitive ends." *Id.* In short, "the ultimate question is whether the burden is a means to an end or an end in and of itself." *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 455 (D.C. Cir. 2018). The Court must simply "identify the purpose, ascertain the burden, and assess the balance between the two." *Id.* In this case, the "burden"—revocation of CNE's casino license—was clearly the end of Amendment 104, in and of itself. Although Amendment 104 was wrapped in the illusory rhetoric of local control, the amendment lacks any provisions bestowing local control on anyone.

In the present case, the burden—targeted revocation of CNE's license—is outstanding. It is undisputed that CNE has never violated Amendment 100 or the Casino Gaming Rules, but Amendment 104 nullifies the license regardless. Unlike *WMX Technologies, Inc.*, Amendment 104 does not just "derail [] expansion plans," but completely nullifies CNE's license. 105 F.3d at 1202. Despite the overwhelming burden, there is no non-punitive purpose of Amendment 104. And suppose for a moment that Defendants are right that the purpose of Amendment 104 is to curb

gaming. The fact is that repealing the Pope County casino license does not do that. Rather, Arkansas citizens will either gamble at the other three Arkansas facilities or gamble across state lines. Indeed, the Defendants have adduced no evidence that revocation of CNE's casino license will "curb gaming" or have any effect on the expansion of gaming. And all of the evidence, including testimony and established public policy, indicates gaming is favored in Arkansas and will continue to increase in Arkansas. Balancing this with the burden on CNE – complete loss of a protectable property interest after spending hundreds of millions of dollars, not including the millions to go to Pope County (which voted against Amendment 104) – establishes that Amendment 104 does not pass the functional test. Turning to the putative purpose of local control, if that was actually the case, the State could have achieved its purpose by much less burdensome, yet still effective, methods. For example, it could have required a local vote on any future casino in any of the 71 counties without a casino license. No person or entity would have lost money or property if that method had been utilized. Or, the State could have required a local election before CNE's license would go into effect, but instead the Amendment revoked CNE's license, and only CNE's license, and requires another state-wide referendum.

Amendment 104 also fails the "motivational test," because its purpose was not local control, or to curb gaming. *See WMX Technologies, Inc.*, 105 F.3d 1195. The proponents coupled revocation with a provision in the same *state-wide* ballot initiative that prohibits the issuance of any future gaming license in Pope County unless yet another *state-wide* ballot initiative is approved that amends the Arkansas Constitution to expressly allow gaming Pope County. This cannot be characterized as "local control" of whether there should be gaming in Pope County. Such a provision is a barrier to the exercise of local control of the question. That's because the purpose was never local control. Nor was the purpose to curb gaming, as the Defendants hypothesized for

the first time after this lawsuit was filed. The real purpose – and the motivation – was to completely eliminate the Pope County casino gaming license to protect an out-of-state entity and its out-of-state casino from competition. Amendment 104 would not have passed without Choctaw Nation funding, and the Choctaw Nation would not have funded the initiative if it had been granted the license in 2019, when it sought but failed to secure the local support required under Amendment 100. After losing its bid to secure the casino license for Pope County, Choctaw Nation has always opposed anyone holding the license other than itself. This was the true—and improper—motive behind the initiative, thereby establishing a bill of attainder under the "motivational test." *Foretich*, 351 F.3d 1198.

Respectfully submitted,

Bart W. Calhoun, Ark. Bar No. 2011221
Scott P. Richardson, Ark. Bar No. 2001208
Brittany D. Webb, Ark. Bar No. 2023139
Lauren McCauley, Ark. Bar No. 2023140
McDaniel Wolff, PLLC
1307 West 4th Street
Little Rock, AR 72201
(501) 954-8000
scott@mcdanielwolff.com
bart@mcdanielwolff.com
bwebb@mcdanielwolff.com
lmccauley@mcdanielwolff.com

and

Paul D. Clement (*pro hac vice*)
James Y. Xi (*pro hac vice*)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
james.xi@clementmurphy.com