IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CHEROKEE NATION BUSINESSES,
LLC;  CHEROKEE NATION
ENTERTAINMENT, LLC;  and
JENNIFER MCGILL                                        PLAINTIFFS

v.                          No. 4:24-cv-969-DPM

STATE OF ARKANSAS;  and ALEX
LIEBLONG, MARK LAMBERTH, STEVE
ANTHONY, DENNY EAST, MICHAEL
POST, JOHN SCHMELZLE, and STEVE
LANDERS, in their official capacities             DEFENDANTS

MEMORANDUM OPINION AND ORDER

"Americans have never been of one mind about gambling, and
attitudes have swung back and forth."  *Murphy v. National Collegiate
Athletic Association*, 584 U.S. 453, 458 (2018).  The casino business is
highly profitable.  And it's an oligopoly, with only a few entities
allowed in this regulated market.  How many, and where, are dictated
by law—often statutory law, but in Arkansas, constitutional law.
The Arkansas Constitution allows amendments by initiated act.
That's the recipe for this case:  Some strong pro-gambling interests;
some strong anti-gambling sentiments;  the opportunity to make much
money;  existing casinos' risk of losing much money;  and gate-keeping
action by many voters whose attitudes about gambling are open to

persuasion through the rough and tumble of political campaigns. For more than a decade, the Cherokee have planned, worked, and spent to build a casino in Pope County, Arkansas. The Choctaw have resisted at almost every step—because, just across the state line in Oklahoma, their casinos are currently serving the northwest Arkansas market. Amendment 104 stopped, at least for now, a Cherokee-owned casino in Pope County. This case asks whether the U.S. Constitution was violated by Arkansas voters' adoption of that Amendment in 2024.

*

**Findings of Fact.** For much of Arkansas's history, legal gambling was an oxymoron. From its territorial days through the early twentieth century, almost all forms of gambling were outlawed. *The Development of the Law of Gambling: Arkansas*, 13 ARK. LAWYER, July 1979, at 108–10 (Part I). Gambling remains illegal today. Ark. Code Ann. § 5-66-101. There are some exceptions. For example, parimutuel betting on greyhound and horse races in Crittenden and Garland Counties has been around since the 1930s. *The Development of the Law of Gambling: Arkansas*, 15 ARK. LAWYER, April 1981, at 78, 79 (Part III). Voters amended the Arkansas Constitution in 1956 to protect those activities in Garland County. ARK. CONST. amend. 46. Other games, like bingo, raffles, and lotteries, were constitutionalized about twenty years ago. ARK. CONST. amends. 84 & 87. Casino gaming came less than a decade ago. ARK. CONST. amend. 100. The facts of this case begin there.

- 2 -

In November 2018, Arkansas voters authorized casino gaming through the State's initiative petition process. That proposal—which is now Amendment 100 to the Arkansas Constitution—authorized four casinos across four counties: Crittenden, Garland, Jefferson, and Pope. One of Amendment 100's lawyer-authors, David Couch, testified that the original version covered only three counties. Pope County was added during the drafting at the Cherokee's request.[1] Amendment 100 also required the Arkansas Racing Commission to issue four casino licenses: two to the existing greyhound and horse racing franchises in Crittenden and Garland Counties, and two to "casino applicants" from Jefferson and Pope Counties. ARK. CONST. amend. 100, §§ 4(j) & 4(k) (amended 2024). The franchise holders were "not required to submit applications for casino licenses in order to be issued a casino license." ARK. CONST. amend. 100, § 4(o). Local majorities in Crittenden, Garland, and Jefferson Counties supported the casino initiative; Pope County voters opposed it by a 60/40 margin.[2] The initiative passed statewide by about 54%.[3] Amendment 100 took effect days later, notwithstanding that local opposition.

Some Pope County voters felt wronged. One was Hans Stiritz, who has lived there for thirty years and staunchly opposes casinos.

---

[1] *Doc. 135 at 79–80.*
[2] *Doc. 136 at 136.*
[3] *Plaintiffs' Exhibit 52 at 01268.*

He believes they have "a very distinct negative impact on families and individuals within the communities where they're located," and "that the casino industry as it currently exists . . . builds wealth for a small group of people at the expense of those vulnerable to addiction."[4] Stiritz campaigned against Amendment 100 ahead of the 2018 election. He also campaigned for an anti-casino mayoral candidate, plus a voter-initiated measure in Pope County that would have required a local election before county officials could support a casino applicant.[5]  In the 2018 election, more voters supported that measure than had opposed Amendment 100.[6]  It passed.  In another swing of mind, though, the Pope County Quorum Court repealed that local-vote-required measure a year after it took effect.  *Citizens for a Better Pope County v. Cross*, 2020 Ark. 279, at 3, 606 S.W.3d 579, 580 (*per curiam*).

Another voter who felt put out was Bill James, a retired father and grandfather who described Pope County as "a pretty wholesome" and "fairly religiously-convicted community."[7]  In his view, "things that are attendant to casinos" aren't good for Pope County, and "local voters ought to be able to make a determination [on] what gets placed in their county[.]"[8]  Like Stiritz, James's longstanding opposition to casinos

_____

[4] *Doc. 135 at 157.*
[5] *Doc. 135 at 97–100.*
[6] *Doc. 136 at 133.*
[7] *Doc. 135 at 199.*
[8] *Ibid.*

- 4 -

pushed him into politics in 2018.[9]  And both men, plus several other like-minded voters, set out to right what they saw as Amendment 100's wrongs.  (More on this later.)

In due course, applicants emerged for the two casino licenses in Jefferson and Pope Counties.  Only one group, the Quapaw Tribe, applied for the Jefferson County license.[10]  The Quapaw received it. Five groups sought the Pope County license.[11]  Among them were Gulfside Casino Partnership, the Choctaw Nation of Oklahoma, and Cherokee Nation Businesses, LLC—the "business arm" of the Cherokee Nation.[12]  (Call that company CNB.)  The Choctaw operate a casino ninety miles west in Pocola, Oklahoma.[13]  The parking lot for that business is in Arkansas.  A casino in Pope County risked siphoning off customers, which, the Choctaw projected, could cost them about $12 million a year.[14]  The Cherokee had eleven casinos—ten on the Cherokee reservation in northeast Oklahoma, and one in Mississippi.[15] They had helped draft Amendment 100, and later provided financial and campaign support for it during the 2018 election.[16]  They viewed a

_____

[9] *Doc. 135 at 189.*

[10] *Doc. 104 at 1.*

[11] *Doc. 136 at 110.*

[12] *Doc. 134 at 18–19.*

[13] *Plaintiff's Exhibit 47 at 3.*

[14] *Doc. 134 at 192;  Plaintiffs' Exhibit 51 at 01182–83.*

[15] *Doc. 134 at 16.*

[16] *Doc. 134 at 18, 77.*

casino in Pope County as a profitable business venture in an area that had once been part of their first reservation.[17]

To qualify as a "casino applicant," these five groups needed the support of Pope County officials—either a letter of support from the county judge, or a resolution of support from the county quorum court. ARK. CONST. amend. 100, § 4(n);  *Citizens for a Better Pope County*, 2020 Ark. 279, at 2, 606 S.W.3d at 580.  The outgoing county judge, Jim Ed Gibson, issued a letter of support to Gulfside in December 2018.[18] Meanwhile, the incoming county judge, Ben Cross, said he "would not be supporting any casino in Pope County" based on the voters' opposition to Amendment 100 in November 2018.[19]

In July 2019, the five casino hopefuls submitted various economic development proposals to Judge Cross.[20]  Judge Cross met with each of them and displayed their proposals in the county courthouse for public viewing.  He and the Cherokee met "at least five to six times to discuss" their proposal, and multiple drafts of an agreement were exchanged.[21] A month later, in August 2019, he and the Cherokee signed a final Economic Development Agreement.[22]

---

[17] *Doc. 134 at 18;  Doc. 135 at 79–80.*
[18] *Doc. 136 at 159.*
[19] *Doc. 136 at 132.*
[20] *Doc. 136 at 134.*
[21] *Doc. 134 at 70–71;  Doc. 136 at 135–136.*
[22] *Plaintiffs' Exhibit 1.*

The EDA committed the Cherokee to more than $40 million in economic development fees and community development grants.[23] It also bound them to spend at least $225 million in construction costs.[24] That cash, in Judge Cross's words, "would have been the most capital investment in Pope County since the construction of our nuclear plants in the 1970s."[25] The resulting economic benefits, and tax dollars, which would pay for a much-needed new county jail and a 911 call center, convinced Judge Cross to support the proposal.[26] The agreement also strengthened the Cherokee's bid for Pope County's casino license. Based on the EDA, the quorum court passed a resolution of support, and Judge Cross issued a letter of "exclusive support," for two Cherokee-owned entities: CNB, and one of its subsidiaries, Legends Resort and Casino, LLC.[27]

Legal battles between the Cherokee and Gulfside soon began. *Cherokee Nation Businesses, LLC v. Gulfside Casino Partnership*, 2021 Ark. 17, 614 S.W.3d 811 (*CNB I*); *Cherokee Nation Businesses, LLC v. Gulfside Casino Partnership*, 2021 Ark. 183, 632 S.W.3d 284 (*CNB II*). Their dispute concerned whether Gulfside, with its letter of support from the *former* county judge, was a qualified casino applicant. A lower

---

[23] *Ibid.*
[24] *Doc. 134 at 20.*
[25] *Doc. 136 at 117.*
[26] *Doc. 136 at 119–121.*
[27] *Plaintiffs' Exhibit 2 & 3.*

court ruled that it was, and the Racing Commission awarded Gulfside the Pope County license in July 2020. More than a year later, though, the Arkansas Supreme Court reversed the lower court's ruling, holding that a qualifying letter of support must come from "the county judge in office at the time the 'casino applicant' submitted its application to the" Racing Commission. *CNB II*, 2021 Ark. 183, at 11, 632 S.W.3d at 290. As a result—and more than two years after the Cherokee had signed the EDA—the Racing Commission "voided the license to Gulfside, and awarded the license to" CNB and Legends (the two Cherokee-owned entities that Judge Cross and the quorum court had supported in 2019). *Cherokee Nation Businesses, LLC v. Gulfside Casino Partnership*, 2023 Ark. 153, at 3, 676 S.W.3d 369, 371 (*CNB III*).[28]

This legal win for the Cherokee was short-lived. As they put it, more litigation "predictably followed."[29] Both Gulfside and the Choctaw (who had intervened in the litigation) challenged the Racing Commission's decision to award one casino license to two entities. And in January 2023, the Pulaski County Circuit Court ruled that the joint CNB/Legends license was "a legal nullity, void and of no effect." *Gulfside Casino Partnership v. Arkansas Racing Commission, et al.*, No. 60CV-21-1653 (12 January 2023). The Arkansas Supreme Court eventually affirmed that decision, holding that Amendment 100

---

[28] *See also Plaintiffs' Exhibit 4.*
[29] *Doc. 127 at 4.*

- 8 -

"provides for *one* license to be awarded to *one* entity for *one* casino." *CNB III*, 2023 Ark. 153, at 9, 676 S.W.3d at 374 (emphasis original). Accordingly, the Supreme Court concluded, the Racing Commission had acted *ultra vires* in issuing a joint casino license to CNB and Legends. *Ibid.* So by late 2023, the Cherokee were set back several steps: No license.

Throughout all that litigation—from mid-2019 to late 2023— the Cherokee pressed forward with their casino plans. They did so vigorously and at great expense. They hired Pope County resident Jennifer McGill as a Community Relations Specialist.[30] They bought about 325 acres of undeveloped land in Pope County.[31] And they signed several big-dollar service agreements with vendors, contractors, architects, and engineers.[32] Almost all these contracts were executed before the Arkansas Supreme Court nullified the joint CNB/Legends license in late 2023,[33] and many of those contractual relationships continued after.[34] To date, the Cherokee have spent more than $60 million on land, construction, employees, and licensing costs in support of a casino.[35]

---

[30] *Plaintiffs' Exhibit 33.*
[31] *Plaintiffs' Exhibits 17–32, 62.*
[32] *Plaintiffs' Exhibits 35–36, 38–40, 50, 53–54, & 65–66.*
[33] *Doc. 134 at 90.*
[34] *Doc. 136 at 54, 175–183.*
[35] *Plaintiffs' Exhibit 59.*

The Cherokee's legal battles were not their only headaches. Anti-casino voters in Pope County—Hans Stiritz, Bill James, Jim Knight, and Rick Thone—also created political ones. This group tried but failed "to remove Pope County as a location for a casino" during the 2020 and 2022 election cycles.[36] In 2020, they formed a ballot question committee called "Fair Play for Arkansas."[37] This was a grassroots effort without political consultants, professional fundraisers, or corporate donors.[38] They raised less than $9,000—about $2,500 of which came from James and Knight.[39] They did not collect enough signatures to get their proposed constitutional amendment on the 2020 ballot.[40] They tried again in 2022 with a ballot question committee called "Fair Play for Arkansas – 2022."[41] Like before, that effort began as a grassroots campaign. But this time, it caught the Choctaw's attention.[42] The Choctaw offered campaign and consulting advice and donated more than $4 million to Fair Play for Arkansas – 2022.[43] As in 2020, though, the 2022 petition did not earn enough signatures to get to

---

[36] *Plaintiffs' Exhibits 49 & 57.*

[37] *Plaintiffs' Exhibit 57.*

[38] *Doc. 135 at 102–03.*

[39] *Plaintiffs' Exhibit 57.*

[40] *Doc. 135 at 192.*

[41] *Plaintiffs' Exhibit 49.*

[42] *Doc. 135 at 104–05.*

[43] *Plaintiffs' Exhibit 47 & 49;  Doc. 135 at 110.*

the ballot.[44]

The political disputes heated up in 2024.  In January of that year, Stiritz, James, Knight, and Thone formed a ballot question committee called "Local Voters in Charge."[45]  LVC proposed an amendment to the Arkansas Constitution "to repeal authorization for a casino and casino gaming in Pope County . . . and to require a local option vote for any future potential casino locations."[46]  Two things were different.  First, LVC switched gears from its 2020 and 2022 iterations and advocated for "local control" over casino gaming—not just eliminating the Pope County casino license.[47]  This switch was at the advice of a seasoned, out-of-state political consultant, another Choctaw-funded resource.  Second, the Choctaw were involved from the start.[48]  They helped draft LVC's proposed amendment;[49]  and they provided consultants, lawyers, and money.

LVC's proposal would do three things.  First, it would repeal the Racing Commission's authority to issue a casino license in Pope County.  Second, it would revoke any casino license that had been issued in Pope County "prior to the effective date" of the amendment.

---

[44] *Doc. 135 at 153.*
[45] *Plaintiffs' Exhibit 11.*
[46] *Ibid.*
[47] *Doc. 135 at 113.*
[48] *E.g., Plaintiffs' Exhibit 9.*
[49] See the Court's earlier Order, *Doc. 112,* for more on the drafting process.

And third, it would require a local election before any new casino license could be issued in any county in the future.[50]

In March 2024, Arkansas's Attorney General certified a popular name and ballot title for LVC's proposed constitutional amendment.[51] (Recall that no one had the Pope County casino license at this point.[52]) In early May, CNB employee Jennifer McGill and others formed a ballot question committee called "Investing in Arkansas," which served as a counter-campaign to LVC's proposed amendment.[53]  Two weeks later, another Cherokee-owned company—Cherokee Nation Entertainment, LLC—applied for the Pope County casino license.[54]   (Call it CNE.) By the end of May, the Cherokee had given close to $1 million to Investing in Arkansas.[55]  In June, Judge Cross issued an updated letter of support for CNE,[56] and, thereafter, the Racing Commission awarded it the Pope County casino license.[57]   In July, Arkansas's Secretary of State certified LVC's proposed amendment as "Issue 2," clearing it for the November 2024 ballot.[58]   For the second time in six years,

--------

[50] *Plaintiffs' Exhibit 10.*
[51] *Doc. 104 at 2.*
[52] *Doc. 136 at 54.*
[53] *Defense Exhibit 13;  Doc. 136 at 69.*
[54] *Plaintiffs' Exhibit 37 at 00670.*
[55] *Doc. 136 at 70.*
[56] *Plaintiffs' Exhibit 5.*
[57] *Plaintiffs' Exhibit 7.*
[58] *Doc. 104 at 3.*

the statewide electorate would decide the fate of casino gaming in Pope County.

The political fight over Issue 2 was gloves off.  In round numbers, the Choctaw spent $17.7 million in support of it, while the Cherokee spent $15.7 million against it.[59]  LVC's only other cash donor, Bill James, gave $100.[60]  With the Choctaw's help, LVC ran television and radio advertisements, put up billboards, hung flyers, sent out text messages, distributed literature, and penned op-eds.[61]  The Cherokee believe these advertisements misled voters about what Issue 2 would do.  They point to some examples:

- "Issue 2 doesn't affect existing jobs, revenues or casinos — just proposals for any new casinos."[62]

- "Issue 2 stops casinos from being forced into communities that don't want them by giving local voters the final say on any future casino."[63]

- "Issue 2 takes power from politicians and gambling lobbyists and gives it to YOU.  That's because Issue 2 puts Local Voters in Charge.  Not politicians, not gambling lobbyists—YOU!  That's why they've sued to take away your vote on Issue 2,

---

[59] *Plaintiffs' Exhibits 11 & 59*.
[60] *Plaintiffs' Exhibit 11 at 00060*.
[61] *Plaintiffs' Exhibits 12, 13, & 60*.
[62] *Plaintiffs' Exhibit 60 at 02321* (text message).
[63] *Plaintiffs' Exhibit 13 at 00178* (text message).

and why they're buying ads, LYING about it."[64]

The Cherokee believe these ads were misleading because Issue 2: revoked their June 2024 casino license; affected Jennifer McGill's job; only gave local voters veto power over potential future casinos, not the power to authorize them; did not give Pope County voters the final say on whether to keep casino gaming, since repealing part of Amendment 100 was a statewide question; and was, in fact, almost exclusively funded by outside interests—the Choctaw Nation. The Cherokee also take issue with the ads' failure to mention them and their existing casino license.

While LVC's marketing materials left some things out, reasonable minds can differ on whether they misled voters. For example, Hans Stiritz testified that he understood the references to "existing casinos" as the brick-and-mortar casinos that were already operating at the time, which didn't include a casino in Pope County.[65] He also wrote an op-ed about Issue 2 for *Arkansas Money & Politics*, in which he acknowledged the Choctaw's involvement: "The fact is, BOTH the FOR and AGAINST campaigns are funded by out-of-state tribal gambling interests. But one supports local voters, while the other

---

[64] *Plaintiffs' Exhibit 12 at 00175* (print advertisement). For more on the ballot-related lawsuit, see *McGill v. Thurston*, 2024 Ark. 146, 698 S.W.3d 121, and *McGill v. Thurston*, 2024 Ark. 149, 699 S.W.3d 45.
[65] *Doc. 135 at 139–40.*

wants to silence them."[66]  Jennifer McGill testified that she didn't know anyone who was misled by LVC's ads.[67]  And perhaps most notably, the Cherokee spent more than $13 million on counter-advertising.[68] Here's what they told voters:

- "Issue 2 will also cripple our economy by eliminating over 1,000 jobs."[69]

- "Issue 2… ELIMINATES Arkansas' Fourth Casino."[70]

- "Don't believe the lies.  Issue 2 is about killing Arkansas' gaming industry for the benefit of greedy out of state billionaires."[71]

- "[Issue 2 is] about reducing the number of casinos in Arkansas. And [it's] paid for by an out of state casino operator trying to stop its competition."[72]

- "Issue 2 would ERASE OUR VOTE on casinos & keep Legends Resort & Casino out of Pope County."[73]

There was undoubtedly some voter confusion about this ballot initiative.  A "yes" vote meant no casino in Pope County;  a "no" vote meant the Cherokee could build one.  The Court credits Judge Cross's

_____

[66] *Plaintiffs' Exhibit 60 at 02326.*
[67] *Doc. 136 at 55.*
[68] *Doc. 136 at 76–77.*
[69] *Defense Exhibit 23* (text message).  McGill clarified at trial that these 1,000 jobs were only prospective jobs, had the Cherokee built a casino.
[70] *Defense Exhibit 25* (campaign mailer).
[71] *Defense Exhibit 26* (campaign mailer).
[72] *Defense Exhibit 28* (campaign mailer).
[73] *Defense Exhibit 29* (campaign mailer).

testimony that he fielded many calls from confused local voters. The Chairman of the Arkansas Racing Commission, Alex Lieblong, also acknowledged that, in response to his granddaughter's confusion, he told her that he didn't understand the proposal, either.[74]

In the November 2024 general election, Issue 2 passed statewide, with 56% of the electorate voting for it, and 44% voting against it.[75] Like the 2018 election, Pope County voted differently than the rest of the state. This time, though, Pope County citizens voted in *favor* of a casino, with 56% opposing Amendment 100's partial repeal, and 44% supporting it.[76]

The Cherokee filed suit three days after the election. They sought a temporary restraining order and a preliminary injunction against the measure's enforcement.[77] The Court held a hearing and denied the TRO motion from the bench.[78] Issue 2 took effect as Amendment 104 to the Arkansas Constitution the next day. The Court consolidated the Cherokee's request for a preliminary injunction with a trial on the merits,[79] ordered expedited discovery,[80] denied LVC's motion to

---

[74] *Doc. 135 at 174.*
[75] *Defense Exhibit 49.*
[76] *Plaintiff's Exhibit 15.*
[77] *Doc. 2.*
[78] *Doc. 18.*
[79] *Doc. 19.*
[80] *Doc. 25.*

intervene,[81] resolved several discovery disputes,[82] and held a three-day bench trial with 12 witnesses and 92 exhibits in March 2025.[83] The Court also requested post-trial briefs from the parties. Those briefs are helpful and appreciated.

*

**Conclusions of Law.** The issues are whether Amendment 104 violates the Contract Clause, Takings Clause, and Bill of Attainder Clause of the U.S. Constitution.

*

Some preliminaries.

*First*, the plaintiffs have standing to press their Contract Clause claims. CNB and CNE are parties to several of the service contracts that they believe Amendment 104 impermissibly impairs.[84] CNB is a party to the EDA. And McGill is, of course, a party to her employment contract.[85] Party status suffices. *Ponchik v. King*, 957 F.2d 608, 609 (8th Cir. 1992) (*per curiam*).

The parties (and *amici*) scuffle over whether CNB and CNE have standing to challenge Amendment 104 as applied to more contracts—

_____

[81] *Doc. 35.*
[82] *Doc. 64, 71, 92, & 112.*
[83] *Doc. 119–124.*
[84] *Plaintiffs' Exhibits 1, 35, 36, 40, 50, & 65.*
[85] *Plaintiffs' Exhibit 33.*

the land and service contracts that Legends Resort and Casino, LLC executed on their behalf. The Court holds that they do, as third-party beneficiaries. *Ibid.* In Arkansas, "a contract made for the benefit of a third party is actionable by such third party." *Howell v. Worth James Construction Co.*, 259 Ark. 627, 629, 535 S.W.2d 826, 828 (1976). While Arkansas law disfavors third-party beneficiaries, it respects their rights when "there is substantial evidence of a clear intention to benefit" them. *Elsner v. Farmers Insurance Group, Inc.*, 364 Ark. 393, 395, 220 S.W.3d 633, 635 (2005). There is here. CNB was the undisclosed principal in all the land deals.[86] And the construction and operation contracts[87] were clearly intended to benefit the casino licensee, which isn't Legends. (At trial, the Court received many of these exhibits subject to a continuing objection from the State.[88] That objection is overruled.)

*Second*, as requested, the Court has reconsidered the Cherokee's equal protection, due process, and no-public-use takings claims.[89] With the benefit of a full record, the Court stands by its earlier rulings.[90] A word, though, on comparators and targeting.

The Cherokee are not similarly situated to the casino licensees in Crittenden, Garland, and Jefferson Counties. The first two were

---

[86] *Plaintiffs' Exhibits 17–32, 62.*
[87] *Plaintiffs' Exhibits 38, 39, 53, 54, & 66.*
[88] *Doc. 134 at 43–45.*
[89] *Doc. 127 at 50–57.*
[90] *Doc. 105 at 8, 12–15.*

"franchise holders" with existing racing/gaming facilities. They didn't have to apply for a casino license because Amendment 100 expressly gave them one. ARK. CONST. amend. 100, § 4(j) & (o). Amendment 100 only called for "casino applicants" from Jefferson and Pope Counties. Like the two franchise-holder counties, Jefferson County supported Amendment 100 in 2018. Pope County did not. Jefferson County had one casino applicant. Pope County did not. Crittenden, Garland, and Jefferson Counties all had up-and-running casinos by early 2024, before proposed Amendment 104 went to the voters. Pope County did not.

What was the root of these differences? These communities, and casino markets, are different. As Cory Morowitz persuasively explained, each of the three existing casinos serves a different market. Unlike the licensees in central and eastern Arkansas, the Cherokee's casino would have served "the northwest suburbs of Arkansas with limited competition."[91] Many voters there viewed the casino industry with skepticism. And the promise of a casino monopoly in that untapped market is why the casino industry spent millions of dollars to change their minds. The other casino licensees don't compare in a legally significant way. "Any material difference between how the plaintiff and those allegedly treated more favorably are situated is sufficient to provide a rational basis for the differential treatment."

---

[91] *Plaintiffs' Exhibit 51 at 01145.*

*Bruning v. City of Omaha*, 6 F.4th 821, 825 (8th Cir. 2021). Voters chose to walk back casino gaming in Pope County. They didn't target the Cherokee.

*

Now, back to the three claims that went to trial.

*Contract Clause.* The Cherokee contend that Amendment 104 impermissibly interferes with the Economic Development Agreement, real estate deals, and service agreements they executed between 2019 and 2023. McGill points to her 2019 employment contract. No one disputes that these are "contracts" for purposes of the Contract Clause. The issues are whether Amendment 104 "impairs" these contracts and, if so, whether the impairment is "substantial." *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 842, 851 (8th Cir. 2002). If the answers are yes, then the Court must decide if the Amendment "is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Association of Equipment Manufacturers v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019) (quotation omitted). The remedy for a Contract Clause violation is limited to declaratory and injunctive relief; damages aren't available. *Carter v. Greenhow*, 114 U.S. 317, 322 (1885); *American Federation of State, County, and Municipal Employees, Local 2957 v. City of Benton*, 2006 WL 8444754, at *6 (E.D. Ark. 27 January 2006).

"[B]efore the Court can determine whether the impairment is substantial, it must first identify what contractual rights, if any, have

- 20 -

been impaired." *Equipment Manufacturers Institute*, 300 F.3d at 851. Much of the briefing and trial focused on substantial impairment. With the benefit of the full record, it is clear that the plaintiffs' contractual obligations were affected but not "impaired" within the meaning of the Contract Clause.

First, the real estate contracts were standard money-for-land deals (and later assignments to Legends) made between 2019 and 2023.[92] Amendment 100 required the Arkansas Racing Commission to "award a casino license to a casino applicant for a casino to be located . . . within two miles of the city limits of the county seat." ARK. CONST. amend 100, § 4(k). According to CNB's Chief Executive Officer, Chuck Garrett, the casino-eligible land in Pope County was "a very narrow defined area" consisting of mostly undeveloped farmland.[93] The small supply and large demand created a seller's market, and sales prices "escalate[d]" after landowners learned of the casino-related need.[94] In total, the Cherokee bought about 325 acres of farmland for much more than its pre-Amendment-100 market value.[95] Amendment 104, however, does not interfere with the Cherokee's ownership or otherwise interfere with the consummated land deals. The land is no doubt much less

---

[92] *Plaintiffs' Exhibits 17–32, 62.*
[93] *Doc. 134 at 55–57.*
[94] *Doc. 134 at 55–56.*
[95] *Doc. 134 at 56–57, 67.*

valuable now that Amendment 104 has scuttled casino gaming in Pope County.  But the Cherokee took a calculated business risk.  "Not every statute which affects the value of a contract . . . impair[s] its obligation." *Sveen v. Melin*, 584 U.S. 811, 823 (2018) (quotations omitted).

Second, according to Garrett, the service agreements with various vendors, contractors, architects, and engineers are rendered "moot" by Amendment 104 because there is "no reason to have those services."[96] True.  Again, though, all these contracts were made between 2019 and 2023—before CNE received its casino license in June 2024.[97]  There was always a risk that these services wouldn't be needed.

Third, the Economic Development Agreement with Pope County does not obligate the Cherokee to do anything yet.[98]  Garrett clarified on cross examination that no payments have been made under that agreement because both triggering events—receiving a casino license *and* opening the casino—haven't happened.[99]  The Cherokee executed the EDA with Pope County while they were casino applicants. The conditions precedent to that agreement have not occurred. Amendment 104 did not impair the Cherokee's contractual obligations.

Last, McGill's employment contract with CNB (and later CNE)

---

[96] *Doc. 134 at 83.*
[97] *Plaintiffs' Exhibits 35–36, 38–40, 50, 53–54, & 65–66.*
[98] *Plaintiffs' Exhibit 1.*
[99] *Doc. 134 at 94.*

wasn't impaired either.  She signed her offer letter in September 2019.[100]
McGill testified that, at the time, she understood "that it was a
possibility [the Cherokee] may not receive the [casino] license at all."[101]
She also acknowledged on cross examination that she is an at-will
employee under Arkansas law.[102]   For most of her employment,
no Cherokee-related entity has held the Pope County casino license.
Her employment continued, and now continues, notwithstanding her
employer's licensure.   Amendment 104 has no doubt affected the
Cherokee's need for her services.  But it did not impair the obligations
of her employment contract.

*

   *Takings Clause.*  The Court trimmed the takings claims in its Order
on the motion to dismiss.[103]  The Cherokee seek just compensation for
the total value of their casino license, plus the reduced value of the 325
acres in Pope County.   They also clarified in their post-trial brief
that they're seeking equitable relief in addition to their no-public-use
claims, which did not go to trial.[104]   Their takings claims are vexed.
Whether the Cherokee had a property interest in the casino license,
whether they have a cause of action for money damages, whether

---

[100] *Plaintiffs' Exhibit 33.*
[101] *Doc. 136 at 47.*
[102] *Doc. 136 at 53.*
[103] *Doc. 105 at 4–8.*
[104] *Doc. 127 at 42 n.8.*

equitable relief is available, and whether sovereign immunity bars their takings claims involve novel questions of state law and nuanced questions of federal law.

Did the Cherokee have a property interest in the casino license? Arkansas law isn't clear. But as the Court has already explained, and the trial reinforced, it's legally plausible that they did.[105] That license had a hefty price tag. Morowitz, an expert with nearly forty years of consulting experience in the casino gaming industry, valued the license at $103.5 million.[106] His calculations were meticulous, his testimony persuasive. The Court need not decide the license-as-property question, though. The takings claims' fatal flaws are procedural.

Start with damages. A claim for just compensation is a claim for damages. *DeVillier v. Texas*, 601 U.S. 285, 292 (2024). But a "suit for damages against a state official in his official capacity is a suit against the State, and the State is not a person under § 1983." *Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017); *see also Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989). Here, the Cherokee seek money damages from the State of Arkansas and seven state officials in their official capacities. The Court flagged this issue right before the trial.[107] In their post-trial brief, the Cherokee acknowledge that "§ 1983 itself

---

[105] *Doc. 105 at 5–6.*

[106] *Plaintiffs' Exhibit 51 at 01178–80.*

[107] *Doc. 105 at 8–10.*

cannot furnish the cause of action to vindicate [their] Fifth Amendment rights."[108]  The Court agrees.  Binding precedent forecloses their claim for takings damages under § 1983.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997).

The Cherokee now urge the Court to recognize a freestanding cause of action under the Takings Clause itself.[109]  This is a late-breaking argument.   It's common ground that implying causes of action has fallen into disfavor.  *Egbert v. Boule*, 596 U.S. 482, 490–91 (2022).  The Supreme Court's precedents "do not cleanly answer the question whether a plaintiff has a cause of action arising directly under the Takings Clause." *DeVillier*, 601 U.S. at 292.  And the Courts of Appeals that have considered this question divide.  The Fifth and Ninth Circuits have held that no such claim exists.  *Devillier v. Texas*, 63 F.4th 416, 420 (5th Cir. 2023) (Higginson, J., concurring in the denial of rehearing en banc), *denying rehearing from*, 53 F.4th 904 (5th Cir. 2023) (*per curiam*), *vacated*, 601 U.S. 285 (2024);  *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992).  The Eleventh Circuit, on the other hand, recently held that the Takings Clause creates a direct cause of action for takings by local governments.  *Fulton v. Fulton County Board of Commissioners*, No. 22-12041, slip op. at 16 (11th Cir. 31 July 2025), *but see*, No. 22-12041, slip op. at 74–108 (Pryor, C.J., dissenting).

---

[108] *Doc. 127 at 43*.
[109] *Doc. 127 at 43–47*.

As in *DeVillier*, this Court need not answer that percolating question at this point. 601 U.S. at 292. The Cherokee have an adequate state remedy:  seeking just compensation from the Arkansas State Claims Commission and the General Assembly. Ark. Code Ann. §§ 25-44-208 & 215.[110] "[C]onstitutional concerns do not arise when property owners have other ways to seek just compensation." *DeVillier*, 601 U.S. at 292. That the available other way is administrative and legislative, rather than judicial, does not render it inadequate. Because the Commission can't approve payment of more than $15,000, the Cherokee will have to make their case to the General Assembly, too. Ark. Code Ann. § 25-44-215(b). This is analogous to the private bills seeking just compensation from the United States before the Tucker Act and those seeking just compensation from a state. *Fulton*, No. 22-12041, slip op. at 92–95 (Pryor, C.J., dissenting);  William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 COLUM. L. REV. 782, 794 n.69 (1995). This Court must, and does, assume that the State and its officers will honor the Takings Clause. *DeVillier*, 601 U.S. at 292–93. Nothing in the record suggests otherwise. The Court is not persuaded that, at this point, the Cherokee can seek takings damages here.

The Cherokee can, of course, sue state officials for injunctive

---

[110] Formerly codified at Ark. Code Ann. §§ 19-10-208 & 215.  Act of 25 March 2025, No. 419, § 305, 2025 Ark. Acts.

relief under § 1983.  *Will*, 491 U.S. at 71 n.10.  But that relief is not available, either.  "As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking."  *Knick v. Township of Scott*, 588 U.S. 180, 201 (2019).  And, as already discussed, the State provides an adequate just compensation remedy through the Claims Commission and the General Assembly.  *E.g.*, *Willis Smith & Co. v. Arkansas*, 548 F.3d 638, 640 (8th Cir. 2008); *see also Light v. Blackwell*, 472 F. Supp. 333, 336–37 (E.D. Ark. 1979), *affirmed without opinion*, 620 F.2d 307 (8th Cir. 1980).

The Cherokee's reliance on *Pharmaceutical Research and Manufacturers of America v. Williams* is therefore misplaced.  64 F.4th 932 (8th Cir. 2023).  That case involved an injunction against repetitive, *future* takings under a Minnesota statute.  *PhRMA*, 64 F.4th at 945.  The Cherokee's situation is different.  "So long as the property owner has some way to *obtain compensation after the fact*, governments need not fear that courts will enjoin their activities."  *PhRMA*, 64 F.4th at 941 (emphasis original and quotations omitted).  The Cherokee have a path to just compensation.  Injunctive relief is therefore "foreclosed."  *Knick*, 588 U.S. at 205.

That leaves sovereign immunity.  The Cherokee argue that Arkansas is not entitled to sovereign immunity because they cannot bring a takings claim in state court.  *Compare EEE Minerals, LLC v. North Dakota*, 81 F.4th 809, 816 (8th Cir. 2023), *with Tri-B Advert., Inc. v.*

- 27 -

*Arkansas State Highway Commission,* 260 Ark. 227, 230, 539 S.W.2d 430, 431–32 (1976). But sovereign immunity is a jurisdictional question. Its absence neither supplies a cause of action nor expands the remedies available under the Takings Clause. In *PhRMA,* for example, the Court of Appeals turned to the question of sovereign immunity *after* it concluded that equitable relief was appropriate. In doing so, the *PhRMA* Court first held that Minnesota's just compensation remedy was inadequate under the circumstances, thereby warranting injunctive relief. 64 F.4th at 945. It then held that sovereign immunity was no bar to that relief under *Ex Parte Young*'s narrow exception for prospective injunctive relief. 64 F.4th at 949–50.

The Supreme Court's decision in *Knick* likewise makes plain that the immunity-tail does not wag the remedy-dog. That case involved a takings claim for declaratory and injunctive relief against a township that had no sovereign immunity. 588 U.S. at 186. The Court held that Knick's takings claim could proceed because "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." 588 U.S. at 189. But it cautioned that as "long as just compensation remedies are available . . . injunctive relief will be foreclosed." *Knick,* 588 U.S. at 205.

In sum, the Court assumes for purposes of decision that the Cherokee have a property interest in the casino license. But their takings claims stumble nonetheless. First, the Cherokee have no

statutory cause of action for damages under § 1983. Second, while injunctive relief is available under § 1983, it is not an appropriate remedy where, as here, the State provides an adequate just compensation remedy for discrete past takings. Third, it would be premature and imprudent for this Court to decide whether the Takings Clause itself provides a cause of action for damages before the Cherokee have availed themselves of that state remedy. All these points hold whether the State is entitled to sovereign immunity or not. This Court is duty-bound to steer clear, if possible, of a collision between the Fifth Amendment's takings guarantee and the Eleventh Amendment's sovereign immunity bar. *See, e.g., Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring).

\*

*Bill of Attainder Clause.* Amendment 104 is not a bill of attainder because it did not single out CNE for punishment. *WMX Technologies, Inc. v. Gasconade County*, 105 F.3d 1195, 1202 (8th Cir. 1997). Issue 2 did not call out CNE by name or describe it in terms of its past conduct. *Ibid.* It referred only to "any casino license issued for Pope County" prior to Amendment 104's effective date.[111] While the Cherokee press that this is a bug, for purposes of the attainder analysis, it is a feature. Arkansas's Attorney General certified a popular name and ballot title

---

[111] *Plaintiffs' Exhibit 10.*

for Issue 2 in March 2024—two months before CNE applied for the casino license, and three months before the Racing Commission issued it the license.[112]  The Pope County Quorum Court was still considering whether to support another casino applicant as late as May 2024.[113] And even after the quorum court decided not to support another applicant, there was always the possibility that the Racing Commission could reject a bid from the Cherokee.[114]

Amendment 104 wholly eliminated casino gaming in Pope County, and necessarily revoked any casino license issued there between March 2024 and November 2024.  A state law "is not made an attainder by the fact that the activity it regulates is described with such particularity that, in probability, few organizations will fall within its purview."  *WMX Technologies, Inc.*, 105 F.3d at 1202.

Even if Amendment 104 did single out CNE, it doesn't punish the Cherokee under the historical test for a bill of attainder.  *Ibid.* Prohibited punishments include "sentences of death, bills of pains and penalties, and legislative bars to participation in specified employments or professions."  *Kapersky Lab, Inc. v. United States Department of Homeland Security*, 909 F.3d 446, 460 (D.C. Cir. 2018) (quotations omitted).  Amendment 104 doesn't bar CNE from operating

---

[112] *Doc. 104 at 2.*

[113] *Doc. 134 at 91–92;  Doc. 135 at 146.*

[114] *See Defense Exhibit 2* (Casino Gaming Rule 2.13).

all its casinos. CNE runs eleven of them.[115] Amendment 104 didn't stop CNE from operating entirely; it took away one of its casino licenses. *Compare WMX Technologies, Inc.*, 105 F.3d at 1202. Plus, though it would be another long and winding road, CNE still has a way to open a casino in Pope County through another constitutional amendment and a local vote.[116] ARK. CONST. amend 104, § 3.

Amendment 104 isn't a bill of attainder under the functional test, either. *WMX Technologies*, 105 F.3d at 1202. It reasonably advances nonpunitive, legislative purposes. Stiritz and James left no doubt: they did not want a casino in their community.[117] Amendment 104 achieved the naysayers' immediate goal. And it may well accomplish their long-term goal of chilling casino gaming in Arkansas.[118] As the Court has said before, wanting fewer rather than more casinos is a rational position, one among various reasonable views on the issue.

Last, Amendment 104 isn't a bill of attainder under the motivational test. *WMX Technologies*, 105 F.3d at 1203. As for the Choctaw, they were out to eliminate a potential competitor. LVC's members had various motivations for pushing Amendment 104—none of which were to punish the Cherokee.[119] These included religious

---

[115] *Doc. 134 at 16.*

[116] *Doc. 135 at 65–68.*

[117] *Doc. 135 at 157–58, 198–99.*

[118] *Doc. 135 at 25–27.*

[119] *Doc. 135 at 157–58, 198–99.*

convictions, protecting those who are vulnerable to addiction, opposing gambling in general, and wanting to keep a wholesome community. As to Arkansas voters, there's no way to know precisely what motivated them. The reasonable inference is that it was some combination of these and other views. There was no evidence, however, that Arkansawyers sought to punish the Cherokee. "[U]nmistakable evidence of punitive intent" doesn't exist here. *Flemming v. Nestor*, 363 U.S. 603, 619 (1960). The Cherokee's claim under the Bill of Attainder Clause fails.

*

The State's oral motion for judgment on partial findings is denied without prejudice as moot.[120] Fed. R. Civ. P. 52(c). The Cherokee's claims under the Contract Clause and the Bill of Attainder Clause will be dismissed with prejudice. Their remaining claims, including under the Takings Clause, will be dismissed without prejudice.

So Ordered.

D.P. Marshall Jr.
United States District Judge

28 August 2025

---

[120] *Doc. 136 at 254.*